[No. B061617. Second Dist., Div. Seven. Feb. 3, 1993.]

A LOCAL AND REGIONAL MONITOR, Plaintiff and Appellant, v.
CITY OF LOS ANGELES et al., Defendants and Respondents;
CITY CENTRE DEVELOPMENT et al., Real Parties In Interest and
Respondents.

**COUNSEL**

Sabrina S. Schiller for Plaintiff and Appellant.

James H. Hahn, City Attorney, Claudia McGhee Henry, Assistant City Attorney, Patricia V. Tubert, Gail C. Weingart and Keith Pritsker, Deputy City Attorneys, Kane, Ballmer & Berkman, R. Bruce Tepper, Jr., Pamela S. Schmidt and Edwin Freston for Defendants and Respondents.

Latham & Watkins, David F. Faustman, Susan S. Azad and Deanna W. Detchemendy for Real Parties in Interest and Respondents.

**OPINION**

**WOODS (Fred), J.—**

I.

INTRODUCTION

Appellant, A Local and Regional Monitor (ALARM), is attempting to halt the development of the downtown Los Angeles Metropolis Project (Project), which includes office, hotel, retail and cultural facilities. Neither ALARM, nor any other entity, challenged the environmental impact report (EIR) for the Project during the certification process or after it was certified by the lead agency, the Los Angeles Community Redevelopment Agency (CRA). In these proceedings, ALARM challenges the EIR by asserting that the City of Los Angeles, acting in its capacity as a responsible agency, erred under the California Environmental Quality Act (CEQA) by not assuming the role of lead agency and preparing a subsequent EIR. ALARM contends that "new information" requiring a subsequent EIR surfaced when the CRA's traffic consultant prepared a letter (Crain Letter) in response to a question asked by the city planning commission's chief hearing examiner.

ALARM also contends that the city council failed to respond properly to ALARM's late mitigation proposals.

ALARM also questions the city council's and CRA's use of public benefits payments received from the real parties in interest, City Centre Development, L.A. Center, Inc., and Agenda California, Inc. (respectively, City Centre, L.A. Center, and Agenda—collectively, Developer) for the transfer of development rights to the Project.

Finally, ALARM contends that the Project is inconsistent with the city's general and community plans because the Project purportedly fails to address alleged jobs/housing imbalances and circulation system problems.

II.

FACTUAL AND PROCEDURAL SYNOPSIS

A. *The Parties*

The Developer proposed building the Project in the central business district redevelopment plan area of downtown Los Angeles (Redevelopment Area).

Respondent CRA, an agency of the State of California, acted as "lead agency" on the Project, was responsible for ensuring compliance with CEQA and for certifying the final EIR and was the public agency with decision-making and approval authority over the Project. The CRA acts as "lead agency" for all projects within the Redevelopment Area.

Respondents, Los Angeles City Council (City Council), its constituent bodies—the Community Redevelopment and Housing Committee (CR&H Committee) and the Planning and Land Use Management Committee (PLUM Committee)—and the city planning commission (Planning Commission) acted as "responsible agencies" with authority to ratify the Project's Owner Participation Agreement (OPA) and to approve the transfer of floor area ratio (or rights) plan (TFAR Plan), which is a subsection of the OPA.

Appellant ALARM is a nonprofit corporation incorporated in July 1990.

B. *The Project*

1. *Downtown Redevelopment*

The Project is a 2.7-million-square-foot, mixed-use development consisting of 3 proposed office towers, including plans for medical office space, a child care center, an amphitheater, and a dining club. The Project will also include a 600-room hotel and a midrise building consisting of a shopping center, specialty and support retail facilities and a public cultural facility.

The Project will be built in five phases over an approximately twelve year period. The Project is sited in a blighted portion of the Redevelopment Area (the South Park area of the central city) bounded by the Harbor Freeway, Ninth Street, Eighth Street and Francisco Street. The area within which the Project is located is zoned for commercial development and has been set aside within the South Park area for commercial and hotel development.

CRA officials have stated that the Project "achieves excellence in design and contributes to the development of the Central City as a major center of the Los Angeles region . . . [and] supports the transit systems such as light rail and Metro Rail which are within walking distance of the project. The [Project] contributes to the creation of an active 24-hour downtown with development of hotel, cultural facility and retail, other than an office-only project [which the Developer is] entitled to develop. It supports the expansion of the Los Angeles Convention Center with [the] development of a 500 to 700 room hotel. . . . The [Project] provides quality open space accessible to the public during the day. It places all vehicular circulation and parking to

below grade structures increasing opportunities for providing pedestrian amenities and landscape gardens and public plazas at the ground level. The [Project] provides increased sidewalk widths with building setbacks to improve pedestrian circulation and participates in the CRA's public art program with [the planned] development of a nonprofit cultural facility which meets the cultural needs of the City of Los Angeles."

### 2. *Owner Participation Agreement (OPA)*

The OPA is a contract between the Developer and the CRA which ensures that the Project promotes the goals and objectives of the central business district redevelopment plan (the Redevelopment Plan) and obligates the Developer to build a specified project on a specified timetable and to carry out environmental mitigation measures. The OPA contains a transportation management agreement that calls for a phase-specific 50-55 percent rideshare requirement to encourage transit use and a peripheral parking program which restricts on-site parking by requiring 40 percent of the office parking to be located off site in a peripheral location. The OPA also includes a replacement housing program and requires the Developer to contribute 1 percent of the total development costs to a public art fund. In addition, the Developer is required to pay a fee to support open space in the South Park area, to make street improvements, to develop on-site transportation management facilities, to contribute toward the Metro Rail assessment, to pay into the city's proposed housing linkage fee and to develop and implement a public art program.

### 3. *Transfer of Floor Area Ratio (TFAR)*

The Project includes a transfer of approximately 695,000 square feet of excess development rights from the convention center expansion area[1] to the Project's site pursuant to the TFAR Ordinance. The TFAR Ordinance sets out the process utilized when a developer seeks to build a project the floor area of which would exceed that allowed by the Redevelopment Plan. In such cases, the owner of the property to be developed (the receiving site) locates one or more nearby parcels of land developed to a density less than

---

[1]Under the Redevelopment Plan, a parcel of land may be developed up to a maximum floor area ratio of 6:1. If a project requires density exceeding that ratio, the density must be transferred from other "donor" sites within the Redevelopment Area. The office components of the Project have a floor area ratio of approximately 6:1; and thus, they arguably could have been built without a transfer of floor area rights. However, because the city and the CRA were desirous of promoting a 24-hour city, the Developer augmented the Project to provide more benefits to the community by adding the retail, hotel, and cultural components to the Project. Thus, the transfer of floor area ratio associated with the Project represents the floor area associated with the hotel, retail and cultural facilities.

that allowed by the zoning ordinance (the donor site). The receiving site owner can then purchase the donor site owner's unused density rights to develop to the density allowed by the zoning ordinance and have the unused density rights transferred to the receiving site. The overall effect of a floor area ratio transfer is that, while certain parcels may be developed to a density much greater than that of other nearby parcels, the overall density of the area is the same as it would have been if all the parcel owners developed their properties to the full extent allowed by the zoning ordinance.

Pursuant to the TFAR Ordinance, the process of transferring floor area ratio in the Redevelopment Area is implemented and administered by the CRA. The city is involved in the approval process of any TFAR Plan after the CRA and the developer reach agreement on the terms of their OPA. After approval, the city planning department is involved if there are any changes in the previously approved TFAR Plan. When the floor area ratio of a donor site is transferred to a project, the compensation given to the CRA for the right to transfer the floor area ratio is termed "public benefit resources."

The City Council enacted the TFAR Ordinance so that the CRA and the Planning Commission could administer the transfer of floor area ratio in a coordinated manner, create records of available floor area ratio, properly allocate and account for public benefit resources derived from the transfers, and facilitate transfers to those projects that generate public benefits and serve a public purpose.

In this instance, the donor site identified for the Project is the Los Angeles Convention Center Expansion Area, the unused density rights of which are owned jointly by the CRA and the city, in accordance with a cooperation agreement dated January 7, 1988, by and among the CRA, the city and the Los Angeles Convention and Exhibition Center Authority (the Cooperation Agreement). Thus, the Developer must compensate the CRA and the city for the floor area transferred to the Project site, and the transfer must be approved in accordance with the TFAR Ordinance and the joint resolution.

4. *Public Benefits*

In compliance with the TFAR Ordinance, the CRA and the Developer must enter into an OPA for the Project which includes, among other matters, a TFAR Plan detailing the public benefits to be provided as a result of the Project's development. As part of the TFAR Plan for this Project, the CRA submitted a public benefits plan under which the Developer will pay approximately $34 million in cash public benefit payments for the transferred floor area ratio. The public benefits plan complies with the Cooperation Agreement by allocating the money 50 percent to the city and 50 percent to the

CRA over the Project's 12-year development. The city proposes to allocate its 50 percent, or $17.5 million, to revitalize the convention center. The CRA proposes to allocate $11.9 million of the Developer's payments for low income housing, $1.7 million for public open space, $1.7 million for child care facilities and $1.7 million for improving transportation systems and facilities. In addition, 86,000 square feet of the Project will be developed by the Developer as an in-kind public benefit in the form of a cultural facility.

C. *Proceedings before the CRA (The Lead Agency)—EIR Certification and OPA Approval*

In June of 1988, the CRA circulated its notice of preparation of the Project's draft EIR (the Draft EIR) to public agencies and concerned groups. On May 9, 1989, the Draft EIR was circulated for public comment.[2] On June 14, 1989, the CRA held public hearings on the Draft EIR. On October 18, 1989, after receiving and responding to public comments, the CRA certified the EIR as final and in compliance with CEQA. Subsequently, on February 15, 1990, the CRA approved the Project, authorized execution of the OPA, and certified that the CRA had reviewed and considered the information contained in the final EIR. The CRA filed a notice of determination in accordance with CEQA on February 15, 1990. This notice was posted from February 23 through March 26, 1990.

The EIR contained extensive information and analyses of the Project's effects on traffic as well as other environmental impacts. The EIR referenced and incorporated an elaborate traffic study (EIR Traffic Study) completed in January 1989 by the CRA's traffic consultant, Crain & Associates.[3]

While the EIR focused primarily on the Project's impact on local streets and freeway on-ramps and off-ramps, the EIR Traffic Study also contained substantial traffic data relating to the regional freeway systems. Based on the EIR Traffic Study, the EIR determined that the Project would have a cumulative, unavoidable, significant, adverse impact on traffic in the Project's vicinity.

The EIR also determined that the Project would have unavoidable significant adverse impacts upon air quality, water, sewage, solid waste, police and fire services, as well as on traffic, which "could not be eliminated or

---

[2] The CRA sent copies of the Draft EIR to numerous agencies, including the California Department of Transportation (Caltrans), the Southern California Rapid Transit District, and the Los Angeles Department of Transportation (DOT).

[3] The EIR Traffic Study is contained in the administrative record. This information was available to the public during the comment period for the Draft EIR.

reduced to an insignificant level by mitigation measures included as part of the proposed project, by measures recommended by public agencies, or by other mitigation measures identified in [the EIR]." The CRA, fully aware of the Project's unmitigatable adverse impacts, nevertheless approved the Project after determining that its benefits outweighed its negative impacts, adopting a statement of overriding considerations in accordance with CEQA Guidelines[4] section 15093.

The CRA also adopted mitigation measures which fully mitigated the Project's impacts on urban design and historic resources, shadow and wind, noise, energy, telephone, housing, and hazardous materials.[5] In addition, despite the fact that the CRA adopted a statement of overriding considerations respecting each of the Project's unavoidable significant impacts, the CRA nonetheless adopted mitigation measures which reduce, but which do not fully mitigate, impacts with respect to traffic, air quality, water, sewage, solid waste, police, and fire protection and emergency services. At no time did anyone from ALARM submit comments or appear before the CRA to challenge the adequacy of the EIR or the Project's final approval. In addition, no entity challenged the CRA's final approval of the Project prior to the date CEQA's statute of limitations expired.

D. *Proceedings before the Responsible Agencies—Approval of the TFAR Plan*

1. *Planning Commission*

Consistent with the requirements of the TFAR Ordinance, the TFAR Plan was submitted for the city's approval. The Planning Commission, acting as a "responsible agency" pursuant to the requirements of CEQA Guidelines section 15096, utilized the certified EIR in considering approval of the TFAR Plan. On April 23, 1990, the city planning department held a public hearing to receive public comments on the TFAR Plan. It was at this hearing that Ms. Sabrina Schiller, now counsel for ALARM, first commented on the Project.[6]

Following this hearing, the hearing examiner prepared a report recommending that the Planning Commission approve the transfer of 695,000 square feet with certain conditions. Included as part of that report were the comments of the chief hearing examiner, Mr. Bob Rogers who interpreted

---

[4] CEQA Guidelines are published in title 14 of the California Code of Regulations, section 15000 et seq.

[5] The EIR determined that no mitigation was required for schools.

[6] ALARM, however, did not yet formally exist in April of 1990.

that newly enacted Public Resources Code section[7] 21092.4[8] required the previously certified EIR to further emphasize effects on regional traffic and questioned whether a "supplement" to the EIR might be necessary to augment the EIR's discussion of cumulative impacts of the Project on regional freeways. Mr. Rogers later concluded a supplement was unnecessary.

In response to Mr. Rogers's comment, Crain & Associates prepared a letter for the CRA on May 25, 1990, (the Crain Letter), using the data from the *already existing* EIR Traffic Study to focus on the Project's cumulative impact on regional freeway traffic. While the analysis contained in the Crain Letter included newly calculated percentage terms for the Harbor Freeway (derived from existing data), its conclusion was *identical* to that of the EIR, namely, that the Project would have a cumulative, unavoidable, significant, adverse impact on traffic in the Project's vicinity. The CRA transmitted the Crain Letter to the planning department and Planning Commission. No "new information" was generated or utilized to clarify this point for Mr. Rogers. *All* of the information utilized to clarify this point was contained in the January 1989 EIR Traffic Study database.

On May 31, 1990, the Planning Commission, an arm of the city acting in its "responsible agency" capacity and in compliance with the TFAR Ordinance, held a public hearing to consider approval of the TFAR Plan. After extensive testimony regarding parking, traffic impacts on surface streets and the Harbor and other regional freeways, proposed traffic mitigation fees for the Project and ridesharing, the commission recommended that the TFAR Plan be approved subject to 20 separate conditions.

Included among those conditions are requirements that (1) the Developer retroactively pay a traffic mitigation fee upon all but the first phase of the Project at such time as the City Council adopts a regional transportation improvement and mitigation (TRIP) ordinance; (2) each of the Project's office phases must meet the ridesharing goals set forth in the OPA for that phase before building permits for subsequent office development will be issued; and (3) parking space be dedicated to high-occupancy vehicles.

The Planning Commission then made the finding of "Overriding Considerations" with respect to the Project's unavoidable significant impacts on traffic, air quality, water, solid waste, sewage, police and fire services as

---

[7]Unless otherwise noted, all statutory references are to the Public Resources Code.

[8]Section 21092.4, which became effective on January 1, 1990, requires lead agencies on projects of statewide, regional or areawide significance to consult with traffic agencies in order to obtain information as to a project's impact on regional traffic systems and public transit. This section does not apply retroactively. (See discussion at fn. 10, *post*.)

required by CEQA in order to approve a project for which an EIR identifies unavoidable significant impacts.

2. *City Council Committees*

On July 9, 1990, the CR&H Committee held a public hearing to consider approval of the TFAR Plan and ratification of the OPA. The CR&H Committee heard extensive testimony from the planning department, the DOT and Caltrans concerning the traffic impacts of the Project and the cumulative traffic impacts of existing and approved developments in the central business district. Testimony indicated that the Project eventually could contribute approximately 3 percent of p.m. peak hour traffic on the downtown portion of the Harbor Freeway and 1 percent on downtown segments of other freeways. The CR&H Committee recommended that the Project be subject to an aggressive ridesharing requirement of 50 percent for the first office phase and 55 percent for future office phases and recommended the City Council approve the TFAR Plan subject to the 20 conditions recommended by the Planning Commission.

The PLUM Committee held a public hearing to consider approval of the TFAR Plan and ratification of the OPA on July 24, 1990. Again, the primary focus of the hearing was the Project's impact on regional freeway traffic. The discussion centered around the retroactive imposition of traffic mitigation fees on all phases of the Project, parking and ridesharing requirements. After reviewing the EIR and other committee reports, the PLUM Committee recommended that the City Council approve the TFAR Plan and ratify the OPA subject to the Planning Commission's conditions.

3. *Full City Council*

The final public hearing for consideration of the TFAR Plan was held before the full City Council on August 24, 1990. The City Council reviewed the reports and recommendations of its committees and received public comments. After thorough review and discussion, the City Council approved the TFAR Plan and ratified the OPA subject to the conditions recommended by the committees, including the increased 50/55 percent ridesharing requirement, and adopted the Planning Commission's findings and statement of overriding considerations. The City Council thus confirmed the judgment of every other decisionmaking body to consider the Project, i.e., that the economic, aesthetic, social, and cultural benefits of the Project outweigh all unavoidable significant impacts. Enforcement of the various conditions and mitigation measures was ensured through the City Council's approval of the Developer's contractual obligations to the CRA.

## E. *The Superior Court Proceedings*

On September 21, 1990, ALARM filed its petition for writ of mandate. After six months of proceedings and trial, the Honorable Richard C. Hubbell granted judgment dismissing the petition. On the question of whether the City Council was required to assume the role of lead agency and prepare a subsequent EIR, the superior court found:

"Where a responsible agency is called upon to grant an approval for a project subject to CEQA and the Statute of Limitations for challenging a lead agency's action under CEQA has expired, Guidelines § 15052(2) requires and authorizes the responsible agency to assume the role of the lead agency only if the lead agency prepared environmental documents for the project but (a) a subsequent EIR is required by CEQA 15162 and (b) the lead agency has granted a final approval for the project.

"Under CEQA, a subsequent or supplemental EIR is required if new information comes to light which was not known and could not have been known at the time the EIR was certified as complete. . . . [The Crain Letter] . . . was prepared at the CRA's request to respond to concerns expressed by the Chief Hearing Examiner about the Project's cumulative effects on the regional freeway traffic system (particularly the Harbor freeway), and his suggestion that a supplemental EIR might be necessary. . . .

". . . After reviewing the evidence, this Court finds that there is substantial evidence in the record to support the City Council's determination that the [Crain Letter] did not contain new information, and its decision declining to prepare a supplemental EIR.

"The [Crain Letter] did not identify any significant environmental impacts other than those already considered in the EIR, did not identify any significant environmental impacts which would cause substantial changes in the circumstances of the Project, and did not identify any new significant impacts substantially more severe than those shown in the EIR. The response, at best, made only minor technical additions to the EIR, none of which raised important additions to the EIR, and none of which raised any important *new* issues about the significant effects on the environment. Guidelines § 15164.

"Moreover, the information contained in the [Crain Letter] could have been known. The EIR's conclusion remained the same after [the Crain Letter]: [The Project] would have a cumulative, unavoidable, significant impact on traffic. . . . After reviewing the response with LADOT, the Chief

Hearing Examiner concluded, 'I find that there is sufficient information to assess the cumulative effect impacts of the projects and related projects and that the final Environmental Impact Report can be deemed adequate.' . . . Because there is substantial evidence in the record to support this conclusion, shared by the City Council, this Court must conclude that no supplemental or a subsequent EIR was required, and that the City was not required to assume the lead agency role."

With respect to ALARM's contention that the City Council was required under CEQA to adopt all of its mitigation measures as proposed and to respond in detail to ALARM's late comments, the superior court found:

"Petitioner contends that it is entitled to a written response from the Respondents as to the rationale for not adopting mitigation measures which Petitioner had considered feasible and appropriate. Respondents were not required to respond to any measures proposed by Petitioner after the EIR was circulated, *i.e.,* after October 18, 1989 at the latest.

"
. . . . . . . . . . . . . . . . . . . . . . . . . .

" 'CEQA does not require analysis of every imaginable alternative or mitigation measure; its concern is with feasible means of reducing [ ] environmental effects.' [*Long Beach Sav. & Loan Assn.* v. *Long Beach Redevelopment Agency* (1986) 188 Cal.App.3d 249, 263 [232 Cal.Rptr. 772].] Mitigation measures are suggestions, the adoption of which depends on economic and technical feasibility and practicality. [*No Slo Transit, Inc.* v. *City of Long Beach* (1987) 197 Cal.App.3d 241, 256 [242 Cal.Rptr. 760].] CEQA does require public agencies to identify significant mitigation measures which avoid or substantially lessen such significant effects, or will mitigate or avoid the significant effects on the environment of projects they decide to approve, whenever it is feasible to do so. [§§ 21002, 21002.1.]

"Moreover, Petitioner's proposed mitigation measures were not ignored. For example, the Council agreed to require [the Developer] to accommodate the relocation of 'worthy of note' buildings on the property. . . . The CRA specifically responded to the proposal that the ridesharing requirement for [the Project] be increased to 20% above SCAQMD's Regulation 15 at the Public Hearing before the Commission's Hearing Examiner, explaining that the then-44% rideshare requirement for [the Project] would in fact achieve a higher rideshare level than the SCAQMD requirement because the [Project's] requirements applied to each person in each building and were not restricted to large employers. . . . At the recommendation of the

Commission, the City adopted a 50-55% ridesharing requirement for the Project. Additionally, to address concerns about [the Project's] impact on regional transportation, the council imposed on the Project a further monetary extraction or TRIP fee, which will used for regional transportation improvements."

On the issue of consistency with the general plan, the superior court found:

"Each of the Respondents expressly found that the [Project] is consistent with the City's general plan. Those findings can be reversed only if, based on the evidence before them, no reasonable person could have reached the same conclusion. [*No Oil, Inc.* v. *City of Los Angeles* (1987) 196 Cal.App.3d 223, 243 [242 Cal.Rptr. 37].] Applying these standards, this Court concludes that the Respondents did not abuse their discretion, and properly found the Project to be consistent with the City's general plan.

"A general plan is a 'statement of policy . . . serv[ing] to provide a standing, consistent answer to recurring questions and to act as a guide for specific plans or programs.' [*Greenebaum* v. *City of Los Angeles* (1984) 153 Cal.App.3d 391, 406 [200 Cal.Rptr. 237].] Thus, a plan such as that for [the Project] need not exactly match the general plan as long as it is 'in agreement or harmony' with the general plan. [*Id.*, at pp. 406-407.]

"There is no inconsistency if the [Project] is viewed in light of the many contributions it will make to furthering the goals of the City's general plan. The Court defers to the Respondents' findings of consistency, because these findings have evidentiary support."

Finally, with respect to ALARM's contention that respondents improperly applied the TFAR Ordinance to the Project, the superior court found:

"Petitioner contends that TFAR public benefits could only be used to mitigate the effects of transferred density. The TFAR ordinance, however, provides that public benefits must be consistent with the Joint Resolution (*i.e.*, 'public benefits' which mitigate the impacts on transportation, housing, open space, historic preservation, cultural, community and public facilities caused by the projects either by themselves or cumulatively with other development in the area'). . . . The Joint Resolution sets forth criteria for the determination of public benefits resources. . . . The [Project's] Public Benefit Plan is consistent with each of these criteria. The Joint Resolution also provides that, within the South Park area (the area in the Central Business District redevelopment project within which [the Project] is sited), the public benefits should be directed toward, *inter alia*, provision of cultural

and community facilities. . . . Finally, the Joint Resolution also authorizes the CRA to direct public benefit resources to other public benefits as may be supported by appropriate findings of the CRA and the Commission. . . . Accordingly, the allocation of a 50% share of the public benefits for the expansion of the Convention Center, a community facility in the South Park sub-area of the CBD Redevelopment Project, is authorized and is consistent with the TFAR Ordinance and Joint Resolution. . . . There is substantial evidence in the record to support Respondents' decision to implement the TFAR Ordinance as specified in the approved Public Benefits Plan.

"。 . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

". . . The TFAR Ordinance specifically contemplates in-kind compensation for transferred floor area rights. . . . The record here contains substantial evidence on which respondents could have based their decision to accept the cultural center as in-kind compensation, . . . thus precluding this Court from setting that decision aside."

The contentions made on this appeal are the same grounds urged in the superior court below. The superior court thoroughly and exhaustively reviewed the evidence and the legal positions advocated by ALARM and concluded that respondents' actions in approving the Project complied with the dictates of CEQA and were supported by substantial evidence. As hereinafter discussed, we are of like mind.

### III.

### DISCUSSION

A. *Standard of Review*

1. *The Trial Court is Afforded Deference*

In mandamus actions, the trial court's decision is entitled to deference. "Regarding the trial court's use of a particular legal standard, in the absence of a contrary indication in the record, we assume a correct standard was used in ruling on the petition [for mandamus]. [Citation.]. ■ ' "A judgment or order of the lower court is *presumed correct.*" ' " (Original italics.) (*Consaul* v. *City of San Diego* (1992) 6 Cal.App.4th 1781, 1792 [8 Cal.Rptr.2d 762].)

2. *Review of Administrative Decisions Requires an Abuse of Discretion Standard*

Regarding ALARM's CEQA administrative challenge, "[j]udicial review under CEQA is generally limited to whether the agency has abused

its discretion by not proceeding as required by law or by making a determination not supported by substantial evidence." (*Sierra Club* v. *County of Sonoma* (1992) 6 Cal.App.4th 1307, 1317 [8 Cal.Rptr.2d 473].) The "whole record" is available to a reviewing court in determining whether there is substantial evidence. (Code Civ. Proc., § 1094.5, subd. (c); § 21168.) Where an action is brought, as here, to challenge an agency's factfinding determinations, "the court shall not exercise its independent judgment." (§ 21168.) The "'reviewing court must resolve reasonable doubts in favor of the administrative finding and decision.'" (*Laurel Heights Improvement Assn.* v. *Regents of University of California* (1988) 47 Cal.3d 376, 393 [253 Cal.Rptr. 426, 764 P.2d 278].)

ALARM is incorrect in contending a de novo standard applies. ■ A decision not to require a subsequent or supplemental EIR is reviewed under an abuse of discretion standard of review. "[W]hen a court reviews an agency decision under section 21166 not to require a subsequent or supplemental EIR on a project, *the traditional, deferential substantial evidence test applies*. The court decides only whether the administrative record as a whole demonstrates substantial evidence to support the determination that the changes in the project or its circumstances were not so substantial as to require major modifications to the EIR." (Italics added.) (*Sierra Club* v. *County of Sonoma, supra,* 6 Cal.App.4th at p. 1318.)

■ Moreover, "[u]nder CEQA, an EIR is presumed adequate." (*State of California* v. *Superior Court* (1990) 222 Cal.App.3d 1416, 1419 [272 Cal.Rptr. 472].) In reviewing the sufficiency of an EIR, the rule of reason applies. (CEQA Guidelines, § 15151 ["the sufficiency of an EIR is to be reviewed in light of what is reasonably feasible."].) "'The court does not pass upon the correctness of the EIR's environmental conclusions, but only upon its sufficiency as an informative document.'" (*Laurel Heights Improvement Assn.* v. *Regents of University of California, supra,* 47 Cal.3d at p. 392.)

■ ALARM also appears to challenge non-CEQA administrative actions involving the TFAR Ordinance and Project approvals. The abuse of discretion standard also applies. Section 1094.5 of the Code of Civil Procedure permits review of administrative orders and decisions only for "abuse of discretion." This standard applies to quasi-judicial administrative decisions involving a "'determination of specific rights in regard to a particular factual situation rather than the formulation of broad policy.'" (*Consaul* v. *City of San Diego, supra,* 6 Cal.App.4th at p. 1792.)

3. *Attacks on General Plan Decisions are Reviewed Upon an Arbitrary, Capricious or Without Evidentiary Basis Standard*

█ ALARM appears to challenge for the first time on appeal the city's general plan itself. Quasi-legislative actions of a city must be upheld unless arbitrary, capricious, or without evidentiary basis. (*Buena Vista Gardens Apartments Assn.* v. *City of San Diego Planning Dept.* (1985) 175 Cal.App.3d 289, 298 [220 Cal.Rptr. 732]; see also *Consaul* v. *City of San Diego, supra,* 6 Cal.App.4th at p. 1792 [quasi-legislative actions of cities are subject to review under ordinary mandamus, citing Code Civ. Proc., § 1094.5].) Review of merits or political wisdom is not permitted because planning is an "inexact science"; courts are ill-equipped to determine whether ordinances are in general harmony with a general plan. (*Bownds* v. *City of Glendale* (1980) 113 Cal.App.3d 875, 883-884 [170 Cal.Rptr. 342].)

B. *The City Council and the superior court correctly determined that no subsequent EIR was required*

█ ALARM's assertion that a subsequent or supplemental EIR is required is seen by this court as a disguised challenge to the EIR's original traffic analysis. ALARM does not dispute the fact that it is barred from directly challenging the EIR by having failed to exhaust its administrative remedies and having failed to challenge the EIR and final Project approval within CEQA's statute of limitations. If any entity, including ALARM, believed that the EIR's traffic analysis was inadequate or that the CRA did not adequately respond to comments submitted during the public comment period on the Draft EIR, that entity's remedy was to challenge certification of the EIR within 30 days of the CRA's posting of the notice of determination, which occurred on February 15, 1990. (§ 21167.) No entity did so, and the time to challenge the EIR and final Project approval by the CRA has long since expired. ALARM has thus been forced into a position of having to make the oblique argument that the City Council was required to assume the role of lead agency from the CRA and prepare a subsequent EIR to address freeway impacts. ALARM must show that the City Council abused its discretion in deciding not to prepare a subsequent EIR. As hereafter discussed, ALARM fails to meet that burden.

1. *The EIR Contained Substantial Information Relating to Freeway Impacts*

ALARM makes the statement that "the EIR's Traffic Section Contains Absolutely No Analysis of Freeway Traffic Impacts Whatsoever." However, our review of the record reveals that the EIR, including the EIR Traffic

Study, discussed the Harbor Freeway at length and contained all of the traffic data needed to analyze regional freeway impacts. Specifically addressing freeway impacts, the EIR Traffic Study stated:

"The project site is adjacent to the arterial streets and the Harbor Freeway. Regional access is furnished by the Harbor Freeway (Route 110), Pasadena Freeway (also Route 110), the Hollywood Freeway (Route 101), and the Santa Monica Freeway (Route 10). The Harbor Freeway, an eight-lane facility immediately adjacent to the proposed development, has interchanges with the Hollywood, Pasadena and Santa Monica Freeways.

"Freeway Ramp connections are available for the following streets:

"Harbor Freeway: 3rd Street, 4th Street, 5th Street, 6th Street, Wilshire Boulevard, 8th Street, 9th Street and Olympic Boulevard.

"Santa Monica Freeway: Vermont Avenue, Hoover Street and Flower Street.

". . . . . . . . . . . . . . . . . . . . . . . . . .

"*Georgia Street*—Also designated a collector street in the project vicinity, Georgia Street has an ADT [average daily traffic volume] of about 5,000 vehicles. This two-lane roadway ends at 9th Street with its extension becoming the 9th Street on-ramp to the Harbor Freeway.

"*8th* Street— . . . Approaching the Harbor Freeway on-ramp, the number of lanes drops to four, including one left-turn and one optional left-turn lane. The ADT on 8th Street adjacent to the site is approximately 21,000 vehicles.

". . . . . . . . . . . . . . . . . . . . . . . . . .

"*9th Street*— . . . Direct freeway access northbound is provided via on— and off-ramps on 9th Street. Near the project site, 9th Street carries an ADT of about 22,000 vehicles and approximately 35,000 vehicles near the Harbor Freeway off-ramp.

". . . . . . . . . . . . . . . . . . . . . . . . . .

"*Harbor Freeway (I-110)*—This north-south freeway is an eight-lane facility providing access to the Downtown area at several ramp locations, including 8th and 9th Streets and Olympic Boulevard (via Blaine Street). It also is the western boundary of the project site. The Harbor Freeway has a present volume of approximately 270,000 vehicles near 9th Street.

"The above streets comprise many of the key intersections affecting project access. In discussions with the [CRA] and the [DOT] staffs, it was agreed that the following intersections would be analyzed to determine the project traffic impacts: . . .

". . . . . . . . . . . . . . . . . . . . . . . . . . . .

"The northbound Harbor Freeway ramps in the vicinity of the project are not currently metered. The Harbor Freeway northbound on-ramps at 9th Street and Georgia Street and at 8th Street are not metered. However, the Harbor Freeway southbound on-ramp at 8th Street and Bixel Street is metered. No high-occupancy vehicle lanes are currently provided at any of these three ramps.

". . . . . . . . . . . . . . . . . . . . . . . . . . . .

"The Downtown area of Los Angeles, both east and west of the Harbor Freeway, is undergoing extensive development growth. Much of the circulation system, including freeways, is experiencing heavy traffic demand as reflected in peak-hour traffic volumes recorded by LADOT, Crain & Associates and other consultants. Traffic volumes on the street system serving the project site are heavy during the morning and afternoon peak periods and are substantially decreased during the evening hours.

"During the morning peak hour, the predominant flow in the area is on the Harbor Freeway northbound 9th Street ramps into the Downtown area. Heavy volumes of traffic travelling northbound on the Harbor Freeway exit into the 9th Street ramps. Morning and afternoon peak hour traffic volumes for 1988 conditions are shown in Figure 3."

With respect to Project trip distribution, the EIR Traffic Study stated:

"The directional trip distribution for the [Project] was estimated largely on the basis of recent studies prepared for similar projects in this vicinity as well as knowledge of Downtown traffic flow patterns. Additionally, SCAG (Southern California Association of Governments) regional model results and the CBD Cordon Count were reviewed to assist in this determination. From these combined sources, the estimated directional distribution of project traffic is approximately as follows:

"North: 35% (including 23% on freeways)

"South: 10% (including 5% on freeways)

"East: 25% (including 14% on freeways)

"West: 30% (including 18% on freeways)

"A separate distribution of 35 percent north, 10 percent south, 15 percent east and 40 percent west was developed and used for study for the hotel component within the project."

The EIR Traffic Study goes on to state:

"The assignment of the (net) project trip generation was accomplished in two steps. The above distribution percentages were used to determine the number of trips associated with each direction. A more discrete trip assignment then was made to the street and freeway network expected to be used. These assignments considered current traffic turning patterns, roadway geometrics, including the availability of left-turn channelization, freeway ramp locations, and to some extent, areas where delay and congestion are or likely would be occurring. . . .

". . . . . . . . . . . . . . . . . . . . . . . . . . .

"The results of this methodology are shown in Figures 4 through 7 for the AM and PM peak hours. In addition, assuming that approximately 50 percent of the existing public parking spaces (390 spaces) might be replaced on site, a trip assignment was performed for this addition. Figure 8 illustrates that assignment."

Moreover, a critical movement analysis and level of service summary was provided not only at street intersections, but also at freeway on-ramps.

With respect to related-project impacts, the EIR Traffic Study determined:

"The most severely affected intersections would be those involved with routes from the northbound 9th Street off-ramp and to the 8th Street on-ramp of the Harbor Freeway; namely 8th Street and Bixel Street/On-ramp, 8th Street and Francisco Street, 9th Street and Francisco Street (east intersection), and 9th Street and Figueroa Street.

". . . . . . . . . . . . . . . . . . . . . . . . .

"When completed, the [Project] would add large daily and peak-hour volumes to the circulation system. Combined with the ambient growth and related project traffic, the project would exacerbate the conditions described

above. Without mitigation, there would be significant project traffic impacts at nine of the above 10 intersections, including both peak hours at seven of those intersections. The project would also significantly affect the 9th Street and Georgia Street/On-Ramp, which would experience LOS E [level of service] in the AM peak hour. Project impacts would be most severe at the Francisco Street intersections and the 8th Street and Bixel Street/On-Ramp."

The traffic study recommended the following mitigation measure "[w]iden and improve the 9th Street northbound off-ramp from the Harbor Freeway."

The traffic study noted that: "The project design allows for the potential widening of the Harbor Freeway near the northwest corner of the site. That improvement, while not planned or necessary as part of this development, retains improvement options for this portion of the Harbor Freeway."

In addition, the EIR Traffic Study contained substantial data relating to traffic entering and exiting the Harbor Freeway. Moreover, the EIR stated:

"*Harbor Freeway (I-110)*—This north-south freeway is an eight-lane facility providing access to the downtown area at several ramp locations, including Eighth and Ninth Streets and Olympic Boulevard (via Blaine Street). It is also the western boundary of the project site. The Harbor Freeway has an average daily traffic volume (ADT) of about 263,000 vehicles near Ninth Street."

The EIR noted that Eighth Street approaching the Harbor Freeway on-ramp carries an ADT of approximately 2,100 vehicles, that Ninth Street "carries an ADT of about 22,000 vehicles and approximately 35,000 vehicles near the Harbor Freeway off-ramp." It also noted that Bixel Street, which terminates into the southbound on-ramp to the Harbor Freeway, handles approximately 14,000 vehicles per day.

Finally, in responding to comments submitted during the Draft EIR comment period, the EIR noted:

"Typically, the majority of hotel traffic is generated by hotel guests. Much of their activity, such as to and from airports, tourist attractions, amusement parks, etc., is expected to be more freeway-oriented than, say, for hotel employee and service activities. For these reasons, a different distribution for the hotel use was assumed, which estimated a higher percentage on the freeway system than for other project uses, such as office and retail."

### 2. *The Superior Court Correctly Determined That the City Council Did Not Abuse Its Discretion in Declining to Prepare a Subsequent EIR*

CEQA Guidelines section 15052, subdivision (a)(2) requires a responsible agency to assume the role of lead agency if the EIR has been certified, the statute of limitations has run and a subsequent EIR becomes necessary pursuant to section 21166 and CEQA Guidelines section 15162. After an EIR has been prepared for a project, section 21166 prohibits agencies from requiring an EIR unless:

"(1) Subsequent changes are proposed in the project . . .

"(2) Substantial changes occur with respect to the circumstances under which the project is undertaken, such as a substantial deterioration in the air quality where the project will be located, which will require important revisions in the previous EIR . . . due to the involvement of new significant environmental impacts not covered in a previous EIR . . . ; or

"(3) New information of substantial importance to the project becomes available, and . . . [t]he information was not known *and could not have been known* at the time the previous EIR was certified as complete . . . and . . . [t]he new information shows . . . one or more significant effects not discussed previously in the EIR [or] [s]ignificant effects previously examined will be substantially more severe than shown in the EIR." (Italics added.) (CEQA Guidelines, § 15162.)

█ " '[S]ection 21166 comes into play precisely because in-depth review has already occurred, the time for challenging the sufficiency of the original EIR has long since expired [citation], and the question is whether circumstances have *changed* enough to justify *repeating* a substantial portion of the process.' " (Original italics.) (*Sierra Club* v. *County of Sonoma, supra,* 6 Cal.App.4th at p. 1317.)

The decision as to whether the circumstances require a shift in lead agency designation and preparation of a subsequent EIR is for the responsible agency alone. (CEQA Guidelines, § 15052.) Accordingly, "[i]n deciding whether a public agency properly determined a subsequent . . . EIR was unnecessary, the standard of review is 'whether the record as a whole contains substantial evidence to support a determination that the changes in the project [or its circumstances] were not so "substantial" as to require "major" modifications to the EIR.' " (*Fund for Environmental Defense* v. *County of Orange* (1988) 204 Cal.App.3d 1538, 1544 [252 Cal.Rptr. 79].)

In making this determination, the reviewing court "may not substitute [its] own judgment for that of the [decisionmaking] agency [here, the City

Council]," (*McMillan* v. *American Gen. Fin. Corp.* (1976) 60 Cal.App.3d 175, 182, fn. 7 [131 Cal.Rptr. 462]) and " 'must resolve reasonable doubts in favor of the [agency's] finding and decision.' " (*Laurel Heights Improvement Assn.* v. *Regents of University of California, supra,* 47 Cal.3d at p. 393.)

In the instant case, the only issue is whether the City Council failed to proceed in the manner required by law by declining to prepare a subsequent or supplemental EIR under the circumstances. ALARM has failed to point to a single piece of evidence in the record which indicates that the freeway traffic analysis contained in the Crain Letter was new information which was not, and could not have been, known at the time the EIR was certified. ALARM has shown no evidence that the Crain Letter identifies new impacts not discussed in the EIR or that impacts previously examined would be significantly more severe than shown in the EIR. Nor has ALARM shown a change in circumstances so substantial as to require major modifications to the EIR. Indeed, the evidence is entirely to the contrary. ALARM's argument has no basis in fact, and we conclude that the argument is devoid of merit.

a. *In relying on the Crain Letter, ALARM fails to establish at least two of three prongs of the "new information" test, all three of which are necessary to trigger a subsequent EIR.*

The "new information" test for a subsequent EIR has three prongs, each of which must be satisfied to trigger preparation of a subsequent EIR; if any prong is not satisfied, the agency is *prohibited* from requiring a subsequent EIR. (See *Sierra Club* v. *County of Sonoma, supra,* 6 Cal.App.4th at p. 1317 ("[S]ection 21166 prohibits agencies from requiring a subsequent or supplemental EIR" unless all statutory requirements are met.].)

These three elements are: (1) that "new" information of substantial importance becomes available; (2) that the "new information" was not known and *could not have been known* at the time the EIR was certified; and (3) that the "new information" shows either that the project will have one or more significant effects not previously discussed in the EIR or that significant effects previously examined will be substantially more severe than shown in the EIR. (CEQA Guidelines, § 15162.)

(1) *The information contained in the Crain Letter "could have been known" (and was known) prior to the time the EIR was certified as it was based upon information contained in the EIR Traffic Study*

ALARM asserts that the May 25, 1990, Crain Letter was a *new* traffic study regarding regional freeway traffic, containing information

which could not have been known[9] at the time the EIR was certified by the CRA. ALARM's assertion, however, does not bear scrutiny. Crain & Associates produced only *one* traffic study for the Project, the EIR Traffic Study which was completed in January 1989. The data in the EIR Traffic Study were incorporated by reference into, and were a part of, the EIR when it was certified by the CRA in October 1989.

The Crain Letter was prompted by the chief hearing examiner's mistaken belief that section 21092.4, which was effective January 1990 (nearly three months after the EIR was certified by the CRA), should be retroactively applied to the EIR.[10] After reviewing public comments submitted at the April 23, 1990, hearing before the Planning Commission's hearing examiner and the examiner's subsequent report, Mr. Rogers, the chief hearing examiner, submitted comments to the Planning Commission expressing his concern about the percentage cumulative effect of the Project on regional freeway traffic (specifically the Harbor Freeway) and suggesting that a "supplement" to the EIR might be necessary in light of section 21092.4's recent enactment. Although the EIR Traffic Study *already* contained all of the data necessary to determine the Project's cumulative effect on regional freeway traffic, Crain & Associates responded to Mr. Rogers's comments by preparing the Crain Letter. The Crain Letter summarized and recharacterized

---

[9]ALARM raises the illusory argument that the information contained in the Crain Letter could not have been known because it was not produced in the face of requests from Caltrans and the city attorney. As discussed previously, the EIR Traffic Study contained all of the necessary information. ALARM now asserts that the CRA did not properly respond to comments raised during the Draft EIR comment period, but ALARM's remedy was to raise its objections before the CRA and challenge the CRA's certification of the EIR within the time limitations imposed by CEQA, not to raise the issue for the first time on appeal.

[10]In its opening brief, ALARM raises a number of issues, one of which is an insinuation that the EIR Traffic Study was somehow inadequate because it did not technically comply with the mandates of section 21092.4, which requires lead agencies to consult with local traffic agencies and analyze regional freeway impacts prior to EIR certification. This statute did not exist when the EIR was certified, and its subsequent enactment did not retroactively invalidate all previous EIR traffic analyses, such as the analysis done in the Project EIR. (See, e.g., *Long Beach Sav. & Loan Assn.* v. *Long Beach Redevelopment Agency, supra,* 188 Cal.App.3d at p. 261, fn. 12 ["Fairness and the need for finality thus requires that the propriety of [the agency's] actions be measured against those regulations in effect as of [the] date when [the agency] presented the [EIR] for public review. . . . the document shall not need to be revised to conform to any new content requirements in guideline amendments taking effect before the document is finally approved."]; *Residents Ad Hoc Stadium Com.* v. *Board of Trustees* (1979) 89 Cal.App.3d 274, 282 [152 Cal.Rptr. 585] [refusing to retroactively apply newly enacted section 21081 to a previously certified EIR].)

the data in the study, focusing on and ultimately alleviating Mr. Rogers's concern that a supplement to the EIR might be necessary.[11]

The Crain Letter contained no "new" information and reached no "new" conclusions; it merely quantified a conclusion implicit in the original EIR Traffic Study, i.e., that traffic on the Harbor Freeway abutting the Project would increase and that therefore traffic impacts would be significant and unavoidable. Thus, not only was the Crain Letter devoid of new information, having contained only information that was known or could have been known at the time the EIR was certified, but the data upon which the Crain Letter was based were part of the original EIR. The Crain Letter could not, therefore, have constituted the basis for the preparation of a subsequent EIR.

(2) *The Crain Letter identified nothing new or different from the information already contained in the EIR*

ALARM urges this court to believe that the Crain Letter contained information which was significantly different from the traffic information contained in the EIR. ALARM is mistaken. The conclusion reached in the EIR Traffic Study, and thus the EIR, was that the Project will have a cumulative, unavoidable, adverse, significant impact on traffic in the Project's vicinity, including the on-ramps and off-ramps to the Harbor freeway. The Crain Letter reached the identical conclusion. (Compare the EIR ["SIGNIFICANT UNAVOIDABLE ADVERSE ENVIRONMENTAL EFFECTS . . . Increased traffic in the project vicinity that would add to traffic congestion; many local intersections would operate at Level of Service E or F in 1995; the project above would have a significant impact [on] between ten and eleven intersections"] *with* the Crain Letter, ["Although these percentages are relatively small, the [Project] would still exacerbate future traffic conditions on the regional freeway system, with a significant impact to the Harbor Freeway through the Downtown area."].)

Thus, the Crain Letter's conclusion was the same, although stated with a slightly different focus, as that reached by the EIR. The Crain Letter did not invoke preparation of a subsequent EIR because it was not new information and it could have been known and was known at the time the EIR was certified. Nor did it show significant new effects or that significant effects

---

[11]In a memo to the Planning Commission, the chief hearing officer stated that: "After reviewing [the Crain Letter] with the Department of Transportation, I find that there is sufficient information to assess the cumulative impacts of the project and related projects and that the final environmental impact report can be deemed adequate." Further, as the trial court concluded, the chief hearing examiner was mistaken in his belief that section 21092.4 retroactively applied to the EIR.

previously identified would be substantially more severe than shown in the EIR. In short, the Crain Letter did not rise to the level of requiring "major" modifications to the EIR. (*Fund for Environmental Defense* v. *County of Orange, supra*, 204 Cal.App.3d at p. 1544.) Accordingly, the City Council was correct in treating the Crain Letter as, at most, an addendum to the EIR. This decision is supported by substantial evidence in the record and is entirely consistent with the law.

b. *The Crain Letter did not constitute a substantial change in circumstances*

A change in circumstances is not sufficient to mandate preparation of a subsequent EIR unless the change is so substantial, as to "require *major* revisions in the environmental impact report." (Italics added). (§ 21166.) Accordingly, when circumstances change in a relatively minor fashion or do not cause any significant impacts other than those already contemplated by the EIR, CEQA does not require preparation of a subsequent EIR.

In *Bowman* v. *City of Petaluma* (1986) 185 Cal.App.3d 1065 [230 Cal.Rptr. 413], changes were proposed in a project's street configuration nearly two years after final EIR certification. These changes modified the traffic flow originally projected in the EIR. The overall impact of the traffic, however, was virtually the same as that projected in the EIR. Thus, the court held that the circumstances did not warrant preparation of a supplemental or subsequent EIR. (*Id.*, at pp. 1078-1081.)

In the instant case, the only purported change in circumstances is the presentation of the information contained in the Crain Letter regarding the Project's percentage impact on the Harbor Freeway. As already discussed, the Crain Letter's information was derived from the EIR Traffic Study database, and its conclusion was identical in substance, if not form, to the conclusion reached by the EIR. The Planning Commission, CR&H Committee, PLUM Committee and City Council all thoroughly considered the information contained in the Crain Letter and then determined that the circumstances did not warrant preparation of a subsequent EIR.[12] Substantial evidence supports the City Council's conclusion that this mere reformulation of the traffic impact already addressed in the EIR did not require major modifications to the EIR. Accordingly, ALARM's argument must fail for want of merit.

---

[12]In fact, even the chief hearing examiner, after reviewing the Crain Letter, no longer recommended that a supplement to the EIR be prepared.

### 3. *Respondents Were Not Required to Hold a Hearing on Whether the Crain Letter Was New Information*

#### a. *ALARM is prohibited from raising this new issue for the first time on appeal*

 ALARM complains, for the first time on appeal, that the City Council failed to make a "decision" that no subsequent EIR was required, asserting that such decision could not be made unless the City Council held a separate, noticed public hearing on whether the Crain Letter constituted "new information" sufficient to warrant a subsequent EIR. At no time during the administrative process did anyone, including ALARM, suggest that a separate public hearing was required. Thus, the doctrine of exhaustion of administrative remedies bars ALARM from raising this issue now. (See § 21177, subd. (a) ["No action may be brought pursuant to Section 21167 unless the alleged grounds for noncompliance with this division were presented to the public agency orally or in writing by any person."]. Nor was the issue of a "hearing requirement" raised before the superior court. It is well established that a party may not raise new issues on appeal not presented to the trial court. (*Estate of Westerman* (1968) 68 Cal.2d 267, 279 [66 Cal.Rptr. 29, 437 P.2d 517].)[13] Accordingly, ALARM is barred from raising this new issue for the first time on appeal.

#### b. *In any event, ALARM's "hearing" assertion is meritless*

 Contrary to ALARM's claims, there is no authority to indicate that CEQA obligated respondents to hold a public hearing on whether the Crain Letter constituted new information or to circulate publicly the Crain Letter. Indeed, none of the cases cited by ALARM supports these propositions.

ALARM describes *Stevens* v. *City of Glendale* (1981) 125 Cal.App.3d 986 [178 Cal.Rptr. 367], as explaining "[t]he procedure for determining whether a subsequent or supplemental EIR is required." The *Stevens* case, however, addressed an entirely different point. In *Stevens*, changes were made to the project itself after the public comment period but before EIR certification. Having timely objected to the EIR's certification, the appellants in *Stevens* persuaded the trial court to return the EIR to "draft" status in order to provide for public comment and review on the EIR—a decision that the Court of Appeal upheld. (*Id.*, at p. 999.)

---

[13]Although there is an exception to this rule if the new issue is purely a question of law based upon uncontroverted facts and involving important questions of public policy (see *Fisher* v. *City of Berkeley* (1984) 37 Cal.3d 644, 654, fn. 3 [209 Cal.Rptr. 682, 693 P.2d 261]), such is not the case here.

*Stevens* noted in dicta that, if an EIR was circulated for review, but later, substantial changes to the project were proposed requiring major revisions to the EIR, "then a subsequent or supplemental EIR will be required and a hearing held thereon." (125 Cal.App.3d at p. 999.) However, *Stevens* itself did not involve a supplemental or subsequent EIR; and indeed, the court expressly found that it would be premature to require a supplemental or subsequent EIR. (*Ibid.*) Thus, the requirements discussed by ALARM are the same requirements that any entity must meet in order to certify an EIR: give notice to the public and provide interested parties with an opportunity to review and comment on the draft EIR. The court did not, as ALARM suggests, require the city to hold a hearing about whether the changes in the project were "new information" requiring a supplemental EIR.

Similarly, in *Concerned Citizens of Costa Mesa, Inc.* v. *32nd Dist. Agricultural Assn.* (1986) 42 Cal.3d 929 [231 Cal.Rptr. 748, 727 P.2d 1029], the actual project built by the defendants differed substantially from the facility described to the public in the EIR. The project actually changed, and the changes included an increase in the size of the project from six to ten acres, a 200 percent increase in the seating capacity of a proposed amphitheater and a relocation of the sound stage so that it faced private homes in the area. The court criticized the defendant district for making significant changes to the project design without preparing a subsequent EIR or even giving notice to the public that the project had been altered. (*Id.*, at pp. 936-940.) As with *Stevens*, the primary concern of the court in *Concerned Citizens* was the defendant's failure to provide the public with a meaningful assessment of the actual project chosen by the city. It did not, however, hold that a separate hearing was required to determine whether the project changes required a subsequent EIR.

Likewise, in *Mira Monte Homeowners Assn.* v. *County of Ventura* (1985) 165 Cal.App.3d 357 [212 Cal.Rptr. 127], the court cited substantial changes in the proposed project as grounds for requiring a subsequent or supplemental EIR when a survey conducted after the circulation of the draft EIR disclosed that a portion of a proposed street would pave over part of a wetland previously thought to be unaffected, thereby endangering a previously unidentified rare plant species. Thus, the discovery in the survey constituted a "significant change" which warranted a supplemental EIR. (*Id.*, at pp. 365-366.) Nowhere, however, did the court suggest that a separate hearing was required to determine that the supplemental EIR was needed; indeed, such a hearing would have been redundant.

Unlike the decisions cited by ALARM, which discuss the supplemental EIR process only tangentially, the court in *Bowman* squarely addressed the nature of an agency's obligation to prepare a subsequent EIR and the test to be applied in reviewing an agency's refusal to do so. Indeed, the court in *Bowman* expressly distinguished the decisions in *Stevens*, and *Mira Monte*, stating that: "None of these cases dealt with . . . the nature of the test to be applied in reviewing the City's failure to prepare a subsequent EIR." (*Bowman* v. *City of Petaluma, supra*, 185 Cal.App.3d at p. 1075.)

There, upholding the trial court's determination that certain project changes were not so significant as to require a subsequent EIR, the court held that agency decisions, including decisions as to what constitutes "substantial changes" in the project requiring "major revisions" to the EIR, should be evaluated under the substantial evidence test, rather than the independent judgment test. (185 Cal.App.3d at p. 1075.) The court noted that such deference will be given to the agency's decision because "in-depth review has already occurred, the time for challenging the sufficiency of the original EIR has long since expired (§ 21167, subd. (c)), and the question is whether the circumstances have *changed* enough to justify *repeating* a substantial portion of the process." (Original italics.) (*Id.*, at p. 1073.) Nowhere did the court in *Bowman* indicate that the test included a public hearing requirement.

In the present case, the EIR adequately evaluated the traffic impact statistics later distilled in the Crain Letter, public notice of the draft EIR was given, interested parties had the opportunity to comment, no "substantial changes" to the project were proposed, and no "new information" was obtained. Respondents' decision that the Crain Letter did not require preparation of a subsequent or supplemental EIR, as evidenced by the chief examiner's comments, was implicit in their decision to approve the TFAR Plan and ratify the OPA without further review in the face of the Crain Letter. That decision was not required to be the product of a separate formal, noticed hearing. As explained above, the record contains substantial evidence to show that the Crain Letter would not have required major modifications to the EIR. Indeed, given that the data came directly from the EIR Traffic Study database and that the conclusion was the same, ALARM has failed to show that the Crain Letter would require any modifications to the EIR.

C. *The Superior Court Correctly Determined That CEQA Did Not Require the City Council to Adopt Verbatim ALARM's Proposed Mitigation Measures or to Respond in Detail to ALARM's Late Comments*

1. *Each of the Impacts Which ALARM Complains Should Be Further Mitigated Were Disposed of By a Statement of Overriding Considerations; Nevertheless, Respondents Required Mitigation as Well*

ALARM contends that the city's findings fail to reflect mitigations sufficient to respond to the seven significant unavoidable adverse impacts associated with the Project. That contention is not supported by the record. Under CEQA's environmental review, if a project will lead to "significant environmental effects," the public agency cannot approve the project unless it adopts "mitigation measures" which "would substantially lessen the significant environmental effects." (§ 21002.) In situations where a project's benefits outweigh its impacts, CEQA Guidelines section 15093 allows the certifying agency to approve the EIR, despite the inability to fully mitigate, by adopting a statement of overriding considerations. Thus, so long as it has made an informed decision in adopting a statement of overriding considerations, an agency need not require mitigation.

ALARM expresses dissatisfaction with the mitigation measures adopted by the City Council. With respect to each of the impacts about which ALARM now complains (i.e., traffic congestion, air quality, water, sewage, solid waste, police and fire services), the EIR determined that such "impacts could not be eliminated or reduced to an insignificant level by mitigation measures included as part of the proposed project, by measures recommended by public agencies, or by other mitigation measures identified in [the EIR]." Here, both the CRA and the City Council adopted a statement of overriding considerations.

Nevertheless, each agency required substantial mitigation measures with respect to even the unavoidable significant impacts.[14] Indeed, the City Council not only adopted the mitigation measures proposed by the CRA, but

[14]Feasible mitigation measures adopted by the CRA (and subsequently adopted by the City Council) included, for example, with respect to traffic congestion, the improvement and widening of Francisco Street and Eighth Street including the dedication of land; widening and improving the Ninth Street northbound off-ramp from the Harbor Freeway; requiring ingress and egress to the Project from both Eighth and Ninth Streets in addition to Francisco Street; requiring one underground parking level to be devoted principally to high occupancy vehicles and traffic staging areas; requiring participation in the CRA peripheral parking program; implementation of a shuttle service between peripheral parking and the Project; and implementation of a comprehensive transportation system management (TSM) program. With respect to air quality, feasible mitigation measures included twice daily wetting of construc-

required additional mitigation measures including, among others, an increased ridesharing requirement of 50 percent in phase one and 55 percent in all other phases; the retroactive imposition of TRIP fees on all but phase one of the Project; the dedication of parking space for high-occupancy vehicles; and a requirement that each office phase of the Project comply with its ridesharing goals before building permits are granted to subsequent office phases.

*2. The City Council Was Not Required to Respond in Detail to ALARM's Late Comments; Nevertheless, the City Council Addressed Them*

ALARM asserts that the City Council was required to provide detailed written responses as to why each of ALARM's comments were not accepted, citing *Cleary* v. *County of Stanislaus* (1981) 118 Cal.App.3d 348, 356 [173 Cal.Rptr. 390] and *People* v. *County of Kern* (1974) 39 Cal.App.3d 830, 840-841 [115 Cal.Rptr. 67]. Both of these cases refer to an agency's duty to specifically respond to comments submitted during the draft EIR comment period. ALARM disregards the fact that its comments were submitted over six months after the Draft EIR comment period expired and two months after the EIR was certified and the lead agency finally approved the Project.

 "[A] lead agency need not respond to each comment made during the review process, however, it must specifically respond to the most significant environmental questions presented. . . . [¶] . . . we note there is no requirement that an agency respond in writing to comments submitted after expiration of the [EIR] comment period." (Citations omitted.) (*Browning-Ferris Industries* v. *City Council* (1986) 181 Cal.App.3d 852, 862 [226 Cal.Rptr. 575]; see also CEQA Guidelines, § 15088, subd. (a).) ALARM's

---

tion areas; the maintenance and operation of equipment so as to minimize exhaust emissions; phasing of construction activities so as to avoid emission peaks; a requirement that construction be discontinued during first and second stage smog alerts; and convenient access to existing or future downtown public transportation systems or transit stops to be incorporated into the Project design so as to encourage the use of mass transportation. With respect to water, feasible mitigation measures included ultra low filter toilets, urinals, taps and shower heads; plumbing fixtures which reduce potential loss from leakage; and a requirement that sprinklers for landscaping be turned on only during nighttime or early morning hours. With respect to solid waste, mitigation included a requirement that the developer employ garbage removal services which recycle appropriate waste materials. Finally, with respect to police and fire protection, mitigation measures included a requirement that elevators, lobbies and parking areas be well illuminated and designed with minimum dead space to eliminate areas of concealment; that the fire department be consulted during Project design prior to initial occupancy to discuss such features as emergency access to the site; an upgraded water system to generate increased flow and residual water pressure; adequate off-site public and on-site private fire hydrants to be determined after the fire department's review of the plot plan; and adequate access roads and turning area for fire department approval, among others.

legal argument that CEQA requires specific responses to its late comments is misplaced.

As ALARM acknowledges, "[a public] agency need not, under CEQA, adopt every nickel and dime mitigation scheme brought to its attention or proposed in the project EIR." (*San Franciscans for Reasonable Growth* v. *City & County of San Francisco* (1989) 209 Cal.App.3d 1502, 1519 [258 Cal.Rptr. 267].)

" 'A court's task is not to weigh conflicting evidence and determine who has the better argument when the dispute is whether adverse effects have been mitigated or could be better mitigated. We have neither the resources nor scientific expertise to engage in such analysis, even if the statutorily prescribed standard of review permitted us to do so. Our limited function is consistent with the principle that "The purpose of CEQA is not to generate paper, but to compel government at all levels to make decisions with environmental consequences in mind. CEQA does not, indeed cannot, guarantee that these decisions will always be those which favor environmental considerations." ' " (*Sierra Club* v. *Gilroy City Council* (1990) 222 Cal.App.3d 30, 40 [271 Cal.Rptr. 393].)

Contrary to ALARM's claims, the city addressed ALARM's proposed mitigation measures. For example, the City Council required that ultra low-flow devices be installed, and agreed to require the Developer to accommodate the relocation of "Worthy-of-Note" buildings on the property. A representative of the CRA specifically responded to Ms. Schiller's proposal that the Project's ridesharing requirement be increased above the South Coast Air Quality Management District's (SCAQMD) Regulation 15 requirement, at the hearing before the Planning Commission's hearing examiner. The CRA representative explained that the then 44 percent rideshare requirement for the Project would in fact achieve a higher rideshare level than the SCAQMD requirement because the Project's requirement applies to each person in each building and is not restricted to large employers. The Planning Commission subsequently recommended, and the City Council adopted, a phased 50/55 percent ridesharing requirement for the Project. Thus, whether the current 50/55 percent ridesharing requirement exactly conforms with ALARM's proposal or not, the City responded to ALARM's concerns and increased the ridesharing requirement for the Project. That the City Council did not specifically adopt ALARM's exact proposal does not make the City Council's mitigation measure inadequate under CEQA.

ALARM also proposed that the Developer be required to remove the 40 percent of vehicles currently scheduled to park in "peripheral" parking

structures to "remote" parking structures. In her comments before the hearing examiner, Ms. Schiller opined that the peripheral parking would be located two blocks from the Project and do nothing to alleviate traffic congestion. The CRA informed Ms. Schiller that the two areas considered for peripheral parking are south of Pico Boulevard and in the vicinity of 9th Street and Union Station, well over two blocks from the Project, and will, in fact, divert 40 percent of the Project's traffic to areas other than the central city vicinity. Whether these lots be designated "peripheral" or "remote," the program is an acceptable, feasible and standard mitigation measure applied to all redevelopment projects in the Redevelopment Area.

Regarding ALARM's proposed mitigation of including residential units within the Project, respondents addressed the real problem: *affordable* housing for low-income workers in the downtown area which will provide these workers with the otherwise unavailable option of living close to where they work. Higher priced on-site housing would attract only those persons who can already afford to live downtown if they so choose, thus contributing less to the overall downtown housing solution. Respondents directly addressed the problem of affordable downtown housing by allocating approximately $12 million of the TFAR payments to the development of low income and very low income housing in the portion of the South Park Area currently zoned for residential development. Respondents found that this significant public benefits payment was an acceptable alternative to housing on-site.[15]

With respect to ALARM's solid waste mitigation suggestion that the Project reserve areas for collection and storage of recyclable materials, the Developer is required to employ garbage removal services which recycle appropriate waste materials. The goal of "recycling" is achieved, although not in the precise method envisioned by ALARM. Finally, with respect to ALARM's proposal that public benefit payments not be applied to transportation mitigations, the allocation of public benefit payments is solely within the discretion of the City Council and the CRA.

Although the record indicates that the City Council considered ALARM's proposed mitigations, adopting some and partially adopting others, the superior court correctly determined that the City Council was not required

---

[15] Planning Commissioner Theodore Stein commented at a Planning Commission hearing: "The concerns that Mrs. Schiller had, I also share in that if I had my druthers I would prefer to see the housing on site. But the location to the freeway and to the convention center and some of the public benefit that will be derived from that, I reluctantly am willing to [accept] the TFAR payment . . . as [an] in lieu substitute for housing so that more low income and very low income housing can . . . be built to meet the residents . . . I think she raised a very valid point, but I think, again, trying to tip that very delicate balance that, on balance in this particular one the in lieu fee does the trick, even though it might not be the best possible solution."

under CEQA to adopt, verbatim, all of ALARM's proposed mitigations and that the City Council exceeded the requirements of CEQA by adopting substantial mitigation measures with respect to all of the Project's significant unavoidable adverse impacts. ALARM's argument that the city failed to consider ALARM's proposed mitigation measures is meritless.

## D. *The Superior Court Correctly Determined That Respondents Properly Applied the TFAR Ordinance to the Project*

ALARM attacks the manner in which Respondents applied the TFAR Ordinance to the Project, both with respect to the way the Planning Commission and CRA allocated the moneys obtained from the Project and their decision to accept in-kind payment for a portion of the transferred density. The TFAR Ordinance does not dictate the specific allocation of proceeds and clearly permits in-kind payments for the transferred density. Respondents complied with all of the procedural and substantive requirements of the TFAR Ordinance.

### 1. *Respondents Can Properly Allocate Funds Derived From the Project to the Convention Center*

The CRA is transferring 609,000 square feet of floor area from the convention center to the Project, for which transfer it will receive monetary payment. The CRA and the Planning Commission have decided, pursuant to the Cooperation Agreement, that all funds derived from the transfer of convention center density would be split equally between CRA and the city. Thus, 50 percent of the moneys derived from this transfer will be given to the city to be used to finance the convention center expansion. Because the city Council and CRA are applying the TFAR Ordinance standards to an individual project, their decision is quasi-adjudicatory and can be overturned only if the record does not contain substantial evidence to support it. (Code Civ. Proc., § 1094.5, subd. (c); cf. *Arnel Development Co.* v. *City of Costa Mesa* (1980) 28 Cal.3d 511, 518, fn. 8 [169 Cal.Rptr. 904, 620 P.2d 565].)

ALARM cites a snippet of the TFAR Ordinance in support of its argument that, by allocating funds to the convention center expansion, respondents violated a legal obligation to apply the fees to mitigate the effects of the transfer. The TFAR Ordinance, however, provides that in acting on a transfer plan, one of the findings required to be made of the commission is that "the transfer plan serves the public interest by providing public benefits, which mitigate the impacts on transportation, housing, open space, historic preservation, cultural, community and public facilities, caused by the [project] either by itself or cumulatively with other development in the area."

The findings are not necessarily related to CEQA's mitigation require-
ments but, rather, are specific to the TFAR Ordinance and the goals of the
Redevelopment Plan. ALARM confuses a responsibility to mitigate under
CEQA with the findings mandated by the TFAR Ordinance. In compliance
with the TFAR Ordinance, the commission found that the convention center
in and of itself constitutes a public benefit within the meaning of the TFAR
Ordinance and that the cash payments helped to mitigate effects on cultural,
community and public facilities. In addition, under the TFAR Ordinance and
Joint Resolution, public benefits include " 'cultural, community and public
facilities.' " The Convention Center expansion, a community facility, thus
fits squarely within the definition of public benefits.

Moreover, as set forth in the joint resolution, public benefit resources may
be applied to "further the goals and objectives of the CBD Redevelopment
Plan and the Central City Community Plan," and should be used primarily
within subareas where the recipient and/or donor sites are located, and
applied toward "projects which are consistent and in conformance with a
comprehensive planning approach." The convention center expansion fulfills
all of these criteria and has been identified as a priority by the City Council
and CRA. (See, e.g., the Cooperation Agreement which provides "the ex-
pansion of the . . . Convention Center . . . [will] meet current demand for
exhibition and meeting space and to attract major national and international
events to the City and the Project area.") Given these objectives, the superior
court correctly found that the CRA and Planning Commission might well
have decided, based upon substantial evidence in the record, that the best use
of the public benefit resources obtained by the city from the Project would
be to assist in the convention center expansion.

2. *The Superior Court Correctly Found That Respondents Could
Properly Accept In-kind Benefits in Payment for the Transferred
Floor Area Ratio*

In addition to the 609,000 square feet the CRA is transferring to the
Project in exchange for money, the CRA is transferring 86,000 square feet to
the Project to build a cultural center for the city and its citizens.[16]
ALARM claims that the cultural center is not a public benefit which
mitigates adverse impacts associated with the transferred density. Once
again, ALARM mischaracterizes what the law requires. The TFAR Ordi-
nance and joint resolution define public benefits as including " 'cultural,
community and public facilities.' " In addition, "in-kind" public benefits,

---

[16]The precise nature of this cultural center has not yet been determined because the OPA
obligates the Developer to conduct a needs assessment at the time the plans for the center are
formulated, and to tailor the center to the results of that assessment.

such as the proposed cultural center, were expressly contemplated by the City Council when it enacted the TFAR Ordinance.

The TFAR Ordinance defines a joint resolution as a joint policy statement "regarding the disposition of public benefit resources in the form of monetary funds *and in kind amenities* derived from a transfer of development rights." (Italics added).

Moreover, the joint resolution specifically states: "Public benefit resources resulting from a Transfer of Development Rights may take the form of monetary payment to the [CRA] or the provision by the developer of public benefits."

Respondents have properly ensured, through the OPA and the TFAR Plan, that the 86,000 square feet will be used for the public benefit/construction of a cultural center; they have agreed that the ratio will not be transferred to the Project until both the CRA and City Council approve the plans for the cultural center. Thus, if the CRA and City Council do not believe the proposed use for the footage sufficiently benefits the city, the Developer will not be able to build that portion of the Project's density currently dedicated to the cultural center.

The TFAR Ordinance entitles the CRA to accept in-kind payment in exchange for the transfer of floor area ratio. The CRA and Planning Commission decided that in-kind payment is appropriate and desirable in this instance. The City Council subsequently approved that decision. As noted earlier, the Respondents' decision to ratify the OPA and approve the TFAR Plan involved the application of standards to individual parcels, and was thus an adjudicatory decision, judicial review of which is subject to the substantial evidence rule. (Code Civ. Proc., § 1094.5, subd. (c).)

Here, the superior court found that the record contains substantial evidence on which respondents could have based their approval—specifically, the ample evidence regarding the need for and desirability of a cultural center in the Project area. (See, e.g., Downtown Art in Public Places Policy [CRA pledged "itself to promote the enhancement of downtown as a cultural center through the support, development and creation of innovative programs, facilities and public artworks encompassing a variety of artistic expression."]; Central Business District Biennial Report ["A major priority has been to make the [Central Business District] a center for art, culture and entertainment" so as to contribute "to the cultural vitality of downtown if downtown is to truly be the hub of the Los Angeles region."].)

The superior court correctly found that respondents applied the TFAR Ordinance to the Project in a completely proper manner. While ALARM

might have made a different choice if it were in respondents' position, that is not a sufficient reason to set aside the decision to accept in-kind payment.

### E. *The Project is Consistent with the General Plan and the Redevelopment Plan*

ALARM contends the Project is inconsistent with both the city's general plan[17] and the Redevelopment Plan. This contention fails because the doctrine of consistency does not apply to the Project, but even if it did, the Project is fully consistent with the city's policy of urbanized city centers.

A general plan is a broad "statement of development policies and . . . objectives, principles, standards, and plan proposals." (Gov. Code, § 65302.) Certain city actions must measure themselves against the general plan in a "consistency" exercise. The Project is not one of the actions to which the consistency doctrine is applied.

Consistency applies to zoning ordinances. Zoning ordinances must be consistent with the plan, and to be consistent, must be "compatible with the objectives, policies, general land uses, and programs specified in such a plan." (Gov. Code, § 65860, subd. (a)(ii); see also *Lesher Communications, Inc.* v. *City of Walnut Creek* (1990) 52 Cal.3d 531, 535-536 [277 Cal.Rptr. 1, 802 P.2d 317].)

Consistency also applies to the elements and documents of the general plan itself. The "general plan and elements and parts thereof" must "comprise an integrated, internally consistent and compatible statement of policies for the adopting agency." (Gov. Code, § 65300.5.)

Because consistency is a statutory requirement, no inconsistency can be stated in the absence of a statutory requirement. (See *Garat* v. *City of Riverside* (1991) 2 Cal.App.4th 259, 294 [3 Cal.Rptr.2d 504] ["[U]nless there is a statutory requirement on point, such unsatisfactoriness or unsuitability may not form a basis for concluding that the plan is legally inadequate."]; see also *Elysian Heights Residents Assn. Inc.* v. *City of Los Angeles, supra,* 182 Cal.App.3d at pp. 28-29 [A project cannot be held to be inconsistent with the general plan because "neither the language of [Government

---

[17] Los Angeles' general plan "consists of 35 community or district plans, each for a separate geographic area, which set forth objectives, policies, programs, and planned development for the next 20 years." (*Elysian Heights Residents Assn., Inc.* v. *City of Los Angeles* (1986) 182 Cal.App.3d 21, 25, fn. 2 [227 Cal.Rptr. 226].) Relevant portions of the general plan are in the record, including the central city community lan, which includes the project area.

Code] section 65860 nor the statutory scheme in general mandates that building permits be scrutinized for plan consistency."].)

Nonetheless, as noted by the superior court, the record here is replete with references to the Project and the TFAR Plan's consistency with the general plan. The general plan contemplates "higher density Centers," such as the central city community plan area. These centers are planned to have a "high density of development and activity" whereas suburbs are to be "predominately residential." "All future high-intensity commercial development will be in the Centers." The central city community plan, which is part of the general plan, states that the downtown area will be "[o]ne of the region's largest employment concentrations."

The Project was designed to ensure its consistency with the Redevelopment Plan, which was programmed to ensure its consistency with the General Plan. The EIR states that the Project contemplated "consistency with the Community Plan." The EIR contains a detailed review of the Project's compliance with the general plan and zoning regulations, separately and in conjunction with proximate projects.

The Project is located in the Redevelopment Area and therefore falls under the aegis of the Redevelopment Plan. The Redevelopment Plan has been found to be "consistent with the adopted Central City Community Plan and all other elements of the General Plan." One of the goals of the Redevelopment Plan is to "assist in the development of downtown as a major Center for the Los Angeles metropolitan region, within the context of the Los Angeles General Plan." When adopted, the Redevelopment Plan was found to comply in all aspects with the general plan, including requirements for public and open space, commercial densities, housing densities, circulation, and others.

On February 15, 1990, the CRA expressly found that the Project was "consistent with" the Redevelopment Plan. The City Council, in turn, found the Project to be consistent with the Redevelopment Plan. The superior court found that the record contained substantial evidence to support these findings.

Nonetheless, ALARM complains there is no consistency. ALARM's argument, however, is itself *inconsistent* with the center's concept. ALARM complains that the area is or will be urbanized, commercialized, and full of jobs. ALARM complains about rising residential property values, congestion in the central city area, a shortfall of housing, long commutes, and competition for homes in the central city area. All of this is contemplated, however,

in the general plan. A center is not the same thing as, for example, the planned de-urbanized Hollywood Hills or the Sepulveda basin. ALARM's tenuous efforts to decentralize the center would conflict with the General Plan's policies. (See *Lesher Communications, Inc.* v. *City of Walnut Creek, supra,* 52 Cal.3d at pp. 535-536 [popularly-passed anti-growth zoning initiative was held to be inconsistent with pro-growth general plan, rendering the initiative void].)

ALARM contends that the jobs/housing balance in the statistical area comprising the city is grossly out of balance. ALARM points to no record reference that any "jobs/housing" balance is inadequate for the planned urbanization of the central city area.

Moreover, ALARM attacks the general plan directly, by arguing that the land use element, which called for growth, was not "correlated" with the circulation element, which cannot support growth. This attack is directly on the general plan because "correlation" is a mandatory requirement for a general plan. (Gov. Code, § 65302, subd. (b).) ALARM's attack upon the general plan is barred by statute and case law. Government Code section 65009, subdivision (c) bars attacks upon general plans which are brought later than 120 days after adoption or amendment of the general plan; the general plan documents as amended, which are in the record, are dated April 3, 1974, and May 2, 1974. (See *Garat* v. *City of Riverside, supra,* 2 Cal.App.4th at pp. 287-289 [improper to argue a zoning ordinance was invalid on the basis of a collateral time-barred attack on general plan inconsistencies, and there is no obligation to update a plan if it becomes obsolete].)

ALARM's consistency argument, therefore has no support in law. ALARM's idea of what should be contained in the central city area is, itself, inconsistent with the general plan's call for urbanization and jobs.

Disposition

The judgment is affirmed. Costs on appeal are awarded to respondents.

Lillie, P. J., concurred. Johnson, J., concurred in the judgment only.

A petition for a rehearing was denied February 25, 1993.