[No. D003324. Fourth Dist., Div. One. Dec. 2, 1986.]

OCEANSIDE MARINA TOWERS ASSOCIATION,
Plaintiff and Appellant, v.
OCEANSIDE COMMUNITY DEVELOPMENT COMMISSION et al.,
Defendants and Respondents.

736

**COUNSEL**

Louis E. Goebel, Cheryl Shensa and Goebel, Shensa & Beale for Plaintiff and Appellant.

Dennis W. Daley, Patricia S. Shaffer and Daley & Heft for Defendants and Respondents.

**OPINION**

**WIENER, J.**—In this mandate action, Oceanside Marina Towers Association (Association) challenges a negative declaration of environmental im-

pact filed pursuant to the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21064) by the Oceanside Community Development Commission (Commission) and the City of Oceanside (City). Members of the Association own and occupy the Marina Towers Luxury Condominiums which are located near the proposed site of a relocated railroad switchyard. The relocation of the switchyard from its current site in downtown Oceanside to the proposed site on the outskirts of the city is a central element in the Commission's downtown redevelopment plan. It is the Association's position that the Commission and the City failed to adequately consider the adverse environmental impact which the relocated switchyard would have on Marina Towers. We conclude, however, that the Association's challenge is barred by the special 30-day statute of limitations provided for in Public Resources Code section 21167, subdivision (b). We also conclude that the notice procedures utilized by the Commission and the City did not violate the Association's due process rights. We therefore affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

The Commission is a redevelopment agency established pursuant to state law (Health & Saf. Code, §§ 33003, 33100) to direct the redevelopment of downtown Oceanside. Consistent with Health and Safety Code section 33200, the Oceanside City Council itself constitutes the Commission. The Commission utilizes City personnel and staff services exclusively. In essence, then, the Commission is the alter ego of the City for redevelopment purposes.

For some time, the central element in the City's downtown redevelopment plan has been the removal of the Santa Fe Railroad switchyard to some alternate location. The present location of the switchyard, in the center of downtown only three blocks from the beach, causes severe traffic congestion and restricts beach access.

Based on a series of environmental and acoustic studies completed in 1983, the City planning department issued a declaration that relocation of the switchyard to a piece of property currently part of the United States Marine Base at Camp Pendleton would not have a significant environmental impact. In June 1983, the Commission sought approval of the project from the California Coastal Commission.[1] At a public hearing held on September 28, 1983, the coastal commission approved both a relocation permit and a consistency certification.

---

[1] In reality, the coastal commission was merely asked to permit removal of the existing switchyard and to issue a consistency certification for relocation of the yard to the Camp Pendleton site which, because of its federal ownership, is not part of the coastal zone.

On August 27, 1984, the City and the Commission held a joint public hearing to consider adoption of a negative declaration of environmental impact on the switchyard relocation project. At the hearing, resolutions approving the negative declaration were adopted. Pursuant to Public Resources Code section 21152, subdivision (a), a notice of determination reflecting the negative declaration was filed with the county clerk and posted on September 3, 1984.

In late October, representatives of the Association contacted the Commission regarding the switchyard relocation project. Following a meeting on November 1, 1984, the Commission responded to the Association's concerns in a detailed letter which addressed the impact the project might be expected to have on surrounding areas. Apparently unsatisfied with the Commission's response, the Association filed the present action on January 18, 1985.

## DISCUSSION

The Association's petition/complaint purports to allege five "causes of action." The central allegations are contained in the first cause of action which asserts that the Commission violated CEQA in approving the negative declaration for the switchyard relocation project. ■ Although many of the allegations are framed in terms of procedural flaws in the Commission's approval process, the petition can also be fairly read to allege that the Commission's finding of no significant environmental impact was not supported by substantial evidence.[2] (See *Shawn* v. *Golden Gate Bridge etc. Dist.* (1976) 60 Cal.App.3d 699, 704 [131 Cal.Rptr. 867].)

The second and fourth causes of action attempt to allege violations of the Association members' due process rights. Although the second cause of action adds little of substance to the allegations contained in the first, we perceive it to be based primarily on the theory articulated in *Horn* v. *County of Ventura* (1979) 24 Cal.3d 605 [156 Cal.Rptr. 718, 596 P.2d 1134] that certain local land use decisions may have such a significant impact on nearby property owners as to constitute a deprivation of property rights entitling the owners to adequate notice and an opportunity to be heard. The fourth cause of action casts the same complaint in the form of an alleged

---

[2]Of particular relevance to this type of case, however, is the fact that "[t]he issue is not whether . . . [the project] will adversely affect particular persons but whether . . . [it] will adversely affect the environment of persons in general." (*Topanga Beach Renters Assn.* v. *Department of General Services* (1976) 58 Cal.App.3d 188, 195 [129 Cal.Rptr. 739]; *Markley* v. *City Council* (1982) 131 Cal.App.3d 656, 670 [182 Cal.Rptr. 659].)

violation of the Association's civil rights actionable under title 42 of the United States Code, section 1983.

The third cause of action for declaratory relief adds nothing to the complaint. A request for attorneys' fees under Code of Civil Procedure section 1021.5 is mistakenly labeled a fifth "cause of action."

The trial court sustained the demurrer without leave to amend on the theory that the entire complaint was barred by the 30-day statute of limitations provided for by Public Resources Code section 21167, subdivision (b). We proceed to address the correctness of that conclusion as it applies to both the Association's CEQA contentions and its due process allegations.

*Alleged Violations of CEQA*

Section 21167 of the Public Resources Code provides a number of special statutes of limitation applicable to CEQA. Subdivision (b) provides in relevant part: "Any action or proceeding alleging that a public agency has improperly determined whether a project may have a significant effect on the environment shall be commenced within 30 days after the filing of the notice required by . . . subdivision (a) of section 21152." Section 21152 requires that any local agency which has determined to carry out a project must file a notice of determination regarding the project's environmental impact with the county clerk. ■ ■ In the present case, following the joint public hearing on August 27, 1984, at which the negative declarations were adopted, the City filed a notice of determination with the Clerk of San Diego County which was posted on September 3.[3] ■ Pursuant to the terms of section 21167, any challenge to the switchyard relocation project under CEQA should have been filed by October 3, 1984. Since a lawsuit was not filed until January of 1985, it appears facially to be barred by the statute of limitations.

The Association argues, however, that the City's notice of determination is ineffective to start the running of the statute because the notice should have been filed by the Commission as "lead agency" because the Commission is principally responsible for carrying out the switchyard relocation

---

[3]In its petition for rehearing, the Association suggests its allegations that the Commission was the lead agency and that the Commission failed to file a notice of determination are sufficient to withstand a demurrer. It is well established, however, "that a general demurrer may consider not only the facts appearing upon the face of the complaint but also any matter of which the court is required to, or may, take judicial notice [citations]." (*Dryden* v. *Tri-Valley Growers* (1977) 65 Cal.App.3d 990, 997 [135 Cal.Rptr. 720].) Pursuant to Evidence Code section 452, subdivisions (c) and (h), we take judicial notice of the fact that the City filed a notice of determination on August 30, 1984.

project. (Pub. Resources Code, § 21067; see Pub. Resources Code, § 21080.1.) The Commission responds that under guidelines provided by title 14 of the California Administrative Code, section 15051, the City was properly designated the lead agency.

Without addressing the technical merits of the "lead agency" question, we believe it would be a colossal elevation of form over substance were we to rule that the running of the statute of limitations depended on which of two participating agencies filed a notice containing exactly the same information with exactly the same county clerk. This is particularly true where, as here, the Commission is the Oceanside City Council and acts as the alter ego of the City. (*Ante,* p. 738.) Other cases dealing with similar issues have consistently reached conclusions supportive of our "substance over form" view. In *Nolan* v. *Redevelopment Agency* (1981) 117 Cal.App.3d 494 [172 Cal.Rptr. 797], the court refused to approve the dismissal of a complaint for failure to name the City of Burbank and the Burbank City Council as indispensable parties. As in the present case, the Burbank City Council was designated the redevelopment agency for the city pursuant to Health and Safety Code section 33200. (*Id.* at p. 499.) The court concluded: "The city council is the redevelopment agency. Although the council may conduct some of its activities using the name of 'Redevelopment Agency,' it is none the less the city council. The council, albeit referred to by its other title, has been a party defendant in this action from the beginning." (*Id.* at p. 501.) Similarly in *National City Business Assn.* v. *City of National City* (1983) 146 Cal.App.3d 1060 [194 Cal.Rptr. 707], this court considered a case in which the city council erroneously constituted itself as a redevelopment "commission" under Health and Safety Code section 33201 rather than an "agency" under section 33200. We concluded that "[t]he error . . . [did] not, however, require a reversal because it caused no prejudice to the Association. A redevelopment agency and a redevelopment commission perform the same functions. (See Health & Saf. Code, § 33202.) By forming a commission, the city council did not invest itself with any greater power or authority. The council simply took an extra, erroneous and meaningless procedural step which does not affect any substantive issue." (*Id.* at p. 1069.)

Here, the error, if any, in designating the City as the "lead agency" for the switchyard relocation project likewise did not prejudice the Association. The information contained in the notice would have been the same regardless of which agency filed it. The special statute of limitations provided for by Public Resources Code section 21167 constitutes a legislative determination that the public interest is not served unless challenges under CEQA are filed promptly. Furthermore, the Legislature has determined that the filing and

posting of the notice of determination constitutes sufficient constructive notice to start the statute running. Thus, the Association received the notice to which it was statutorily entitled for statute of limitations purposes and the trial court correctly determined its CEQA challenge was time-barred.

*Constitutional Adequacy of Notice*

Public Resources Code section 21092 establishes express notice requirements before a local agency can adopt a negative declaration of environmental impact. The statute requires that notice be given: ". . . to all organizations and individuals who have previously requested such notice and shall also be given by at least one of the following procedures:

"(a) Publication, . . . by the public agency in a newspaper of general circulation in the area affected by the proposed project.

"(b) Posting of notice by the public agency on- and off-site in the area where the project is to be located.

"(c) Direct mailing to the owners of contiguous property . . . ." Undisputed evidence before the trial court established that notice of the August 27 hearing was published in the Oceanside Blade Tribune on August 15 and 20, 1984. Thus, the statutory requirement of section 21092, subdivision (a) was complied with.

The Association attempts to buttress its argument by pointing to coastal commission regulations which require mailed notice to all property owners within 100 feet of the parcel on which the project is planned. (See Cal. Admin. Code, tit. 14, § 13054.)[4] Inferentially the Association argues it should have at least received individual mailed notice of the September 1983 coastal commission hearing on the project (*ante,* p. 738) which would have put it in a position to participate in the August 1984 negative declaration hearing. It is not at all clear, however, that any such violation is the proper subject of a mandate action against the Community Development Commission. Under the applicable administrative regulations, the coastal commission is required to revoke a permit previously issued "if it determines that the permit was granted without proper notice having been given." (Cal.

---

[4]Section 13054 also requires the posting of a notice "as close as possible to the site of the proposed development." The declaration of a planning technician for the City explained he had no specific recollection of posting a notice on the switchyard relocation project but described that his habit and practice was always to do so. The Association presented no evidence to suggest that the notice was not posted.

Admin. Code, tit. 14, § 13054, subd. (c).) It would appear that the proper remedy for such a violation is a petition for writ of mandate to compel the coastal commission to revoke its permit, not a writ of mandate to the Community Development Commission.[5] In any event, a declaration from the relocation project manager states that she determined that the Marina Towers property was located more than 100 feet from the property on which the switchyard was to be constructed.[6]

It would thus appear that the City and the Commission complied with express statutory notice requirements for both the negative declaration hearing and the coastal commission hearing. Relying on *Horn v. County of Ventura, supra,* 24 Cal.3d 605, however, the Association asserts it was constitutionally entitled to actual mailed notice of the Commission's plan to relocate the switchyard. *Horn* involved a county's approval of a tentative subdivision map for a piece of property adjacent to the plaintiff's property. The county planning department approved the tentative map and issued a negative declaration under CEQA without a public hearing. Plaintiff thereafter found out about the subdivision plan and brought suit against the county, alleging that the proposed residential construction would substantially interfere with the only access from his property to the public streets and would increase traffic congestion and air pollution. (*Id.* at pp. 611, 615.) The Supreme Court held that the approval of a subdivision constitutes an "adjudicatory" act which implicates the right to a due process hearing and that plaintiff's complaint alleged a sufficient deprivation of property rights to invoke his constitutional notice and hearing rights. (*Id.* at p. 615.) Reviewing the county's CEQA notice procedures, the court concluded that the posting of notices at central public buildings and mailings to persons who specifically requested it were insufficient to satisfy the due process rights of persons like the plaintiff who owned property adjacent to the subject parcel. It carefully refrained, however, ". . . from describing a specific formula which details the nature, content, and timing of the requisite notice. Rather, we leave to the affected local governments these determi-

---

[5] The complaint does not specifically indicate whether the Association ever made the coastal commission aware of its assertion regarding the adequacy of the notice. Counsel for the Association candidly conceded at oral argument that he was unaware of any such contact with the coastal commission. We assume under the circumstances that affording the Association leave to amend its complaint would be an idle act. (See *Goodman v. Kennedy* (1976) 18 Cal.3d 335, 349-350 [134 Cal.Rptr. 375, 556 P.2d 737].)

[6] We intentionally finesse the procedural questions created by both parties' reference in their demurrer arguments to factual declarations submitted to the trial court in support of and in opposition to the Association's request for a preliminary injunction. Neither party objected to the practice, and the entire proceeding appears more in the nature of a motion for summary judgment. In any event, we assume that most of the facts we consider relevant to this appeal are appropriate subjects for judicial notice. (See Evid. Code, § 452.)

nations. We do observe, however, that depending on (1) the magnitude of the project, and (2) the degree to which a particular landowner's interests may be affected, acceptable techniques might include notice by mail to the owners of record of property situate within a designated radius of the subject property, or by the posting of notice at or near the project site, or both. Notice must, of course, occur sufficiently prior to a final decision to permit a 'meaningful' predeprivation hearing to affected landowners." (*Id.* at p. 618.)

The Association asserts that its members are adjacent landowners in the identical position of the plaintiff in *Horn* and were accordingly entitled to individual mailed notice. It contends that the lack of constitutionally adequate notice precludes the Commission from invoking the statute of limitations defense as to the CEQA allegations. Furthermore, the Association relies on the alleged lack of due process in asserting an independent cause of action under the federal civil rights statutes. (42 U.S.C. § 1983.)

Although the Association's petition/complaint is replete with allegations that no notice of any of the relevant hearings or actions was mailed to the Association or its members,[7] conspicuous by its absence is any allegation that the Association was actually unaware of the various proceedings leading up to approval of the relocation project and specifically the joint public hearing at which the negative declaration was adopted. While this omission might be inadvertent, it is hardly surprising in view of the extensive coverage the relocation project received in the local press. We are concerned that the Association is asking us to declare the statutory notice procedures followed in this case constitutionally insufficient under *Horn* even though it cannot allege that additional notice procedures would have made any difference, i.e., that the Association was unaware of the proposed relocation project and that had it been aware, it would have appeared at the hearing to assert its interests.

In any event, there is a critical distinction between this case and *Horn* which makes the *Horn* holding inapplicable. The first issue confronted by the *Horn* court was whether a subdivision approval constituted a "quasi-legislative" or "quasi-adjudicatory" act by the local government entity. ■ The court explained: "[O]nly those governmental decisions which are *adjudicative* in nature are subject to procedural due process principles. *Legislative* action is not burdened by such requirements. [Citations.] The rationale of the 'legislative-adjudicatory' distinction was well expressed many years ago by Justice Holmes in *Bi-Metallic Co.* v. *Colorado* (1915) 239 U.S. 441 . . . .

---

[7] A declaration to this effect was also filed by the Association's manager, Robert P. Fraas.

"We adopted similar reasoning recently in *San Diego Bldg. Contractors Assn.* v. *City Council* (1974) 13 Cal.3d 205 [118 Cal.Rptr. 146, 529 P.2d 570, 72 A.L.R.3d 973], in which we concluded that the enactment of a general zoning ordinance by a city's voters under the initiative process, being 'legislative' in character, required no prior notice and hearing, even though it might well be anticipated that the ordinance would deprive persons of significant property interests. (P. 211.) In so holding, we distinguished 'adjudicatory' matters in which 'the government's action affecting an individual [is] determined by facts peculiar to the individual case' from 'legislative' decisions which involve the adoption of a 'broad, generally applicable rule of conduct on the basis of general public policy.' (Pp. 212-213; [citations].)" (24 Cal.3d at pp. 612-613.) It then concluded that because a subdivision approval is "determined by facts peculiar to the individual case," it is an "adjudicatory" act subject to due process notice and hearing requirements. (*Id.* at pp. 614-615.)

In the present case, we deal not with a governmental entity's decision to approve a private party's subdivision but rather with the key element in a community redevelopment plan which requires that a railroad switchyard be moved to a different location. The decision as to such location is effectively the same as a public entity's selection of a site for a new public improvement. Although these types of decisions have substantial impact on surrounding properties, they have consistently been held to be "legislative" acts exempt from due process hearing requirements. In *San Diego Bldg. Contractors Assn.* v. *City Council* (1974) 13 Cal.3d 205 [118 Cal.Rptr. 146, 529 P.2d 570, 72 A.L.R.3d 973] on which *Horn* was based, the court responded to plaintiffs' argument that the adoption of a zoning ordinance requires notice and a hearing because it has a substantial impact on property values: "[A]lthough zoning measures frequently do significantly affect real property values, this attribute does not distinguish such measures from a host of other legislative enactments which may have an equally important impact on those values. For example, legislative decisions as to the *location of public improvements* . . . have considerable direct effect on land values . . . . Plaintiffs suggest no reasons why zoning measures should invoke different constitutional procedures . . . ." (13 Cal.3d at p. 213, italics added.)

The principle that decisions of public entities as to the location of public improvements are legislative in character has been applied by both the Supreme Court and the Courts of Appeal in a variety of contexts. In *Wheelright* v. *County of Marin* (1970) 2 Cal.3d 448, 458 [85 Cal.Rptr. 809, 467 P.2d 537], the Supreme Court held that the county's approval of a precise development plan for the construction of an access road was a legislative

determination. (See also *Yost* v. *Thomas* (1984) 36 Cal.3d 561, 570 [205 Cal.Rptr. 801, 685 P.2d 1152] (city's adoption of a "specific plan" for private development of a 32-acre parcel characterized as a legislative act).) Similarly in *Sinclair* v. *State of California* (1961) 194 Cal.App.2d 397, 406-407 [15 Cal.Rptr. 493], the court held that the highway commission's selection of a freeway route was a quasi-legislative act which could be accomplished without a hearing. And recently in *Sagaser* v. *McCarthy* (1986) 176 Cal.App.3d 288 [221 Cal.Rptr. 746], the court considered a challenge to the Legislature's decision regarding the site of a future prison. Rejecting appellants' contention that they were entitled to notice and a hearing on the selection of a prison site, the court explained that "the selection of a prison site is a purely legislative and political act. There is no constitutional requirement for a hearing in any legislative proceeding."[8] (*Id.* at p. 312.)

The rationale underlying these cases is that a quasi-adjudicative land use determination is based largely if not exclusively on facts peculiar to the affected locale. In contrast, however, the considerations relevant to the siting of a public improvement are not so limited. To be sure, one significant factor to be considered by the public entity is the effect the improvement will have on surrounding properties. But the entity must then balance those effects against the benefits accruing to the public generally as a result of the improvement.

The facts of *Horn* and the present case illustrate the contrast. In *Horn,* the considerations relevant to the county's decision whether to approve the subdivision were largely limited to the landowner's interests in developing his property as against the difficulties such development would occasion for adjacent property owners. In the present case, however, the Commission and City are called upon to consider the interests of nearby property owners such as the Association as well as those of property owners and businesses in the downtown area who would be benefitted by the removal of the switchyard, area residents whose access to the downtown area and beaches would be improved, and motorists who would benefit from reduced traffic

---

[8] Attempting to distinguish *Sagaser*, the Association argues that the adoption of a negative declaration is an "adjudicatory" act giving rise to notice and hearing prerequisites. The argument misses the point. The proper focus is on the action of the governmental entity which results in a "significant deprivation of property." (*Horn, supra,* 24 Cal.3d at p. 615.) Thus, in *Horn*, a negative declaration under CEQA was prepared but that action was not the focus of the court's inquiry. Rather, the court considered whether the ultimate approval of the subdivision by the county constituted a legislative or adjudicatory act. (*Id.* at pp. 614-615.) Similarly here, the adoption of a negative declaration works no deprivation of property rights. It is the City's and Commission's decision to relocate the switchyard which "'substantially affect[s]' the property rights of owners of adjacent parcels . . ." (*id.* at p. 615), and must be evaluated.

congestion. Indirect community factors must also be evaluated such as the increased tax base a rejuvenated downtown business district might create. In sum, the relocation of the switchyard, like any other decision regarding the location of a public improvement, requires the assessment of a broad spectrum of community costs and benefits which cannot be limited to "facts peculiar to the individual case." (*San Diego Bldg. Contractors Assn.* v. *City Council, supra,* 13 Cal.3d at p. 212.) As the Supreme Court and the Courts of Appeal have consistently held, such a decision is therefore a quasi-legislative act to which due process notice and hearing requirements are inapplicable.

Accordingly, the Association has failed to allege a violation of its due process rights and the demurrer was properly sustained.

## DISPOSITION

Judgment affirmed.

Kremer, P. J., and Lewis, J., concurred.

A petition for a rehearing was denied December 24, 1986, and appellant's petition for review by the Supreme Court was denied February 26, 1987.