[No. G032990. Fourth Dist., Div. Three. Oct. 5, 2004.]

EL MORRO COMMUNITY ASSOCIATION et al., Plaintiffs and
Appellants, v.
CALIFORNIA DEPARTMENT OF PARKS AND RECREATION et al.,
Defendants and Respondents.

**COUNSEL**

Moskowitz, Brestoff, Winston & Blinderman, Nelson E. Brestoff; Van Blarcom, Leibold, McClendon & Mann, John G. McClendon and Stephen M. Miles for Plaintiffs and Appellants.

Bill Lockyer, Attorney General, Mary Hackenbracht, Assistant Attorney General, Jamee Jordan Patterson and Hayley Peterson, Deputy Attorneys General, for Defendants and Respondents.

## OPINION

**O'LEARY, J.**—The El Morro Community Association (EMCA) and the Wise Use Front (WUF) appeal from a judgment denying their petition for a writ of mandate to compel the California Department of Parks and Recreation (the Department) to rescind its certification of the environmental impact report (EIR) for a project located within Crystal Cove State Park. The project involves demolition of a private beachfront mobile home park (upon the impending expiration of the residents' leases) and conversion of the site to public facilities including a campground, parking, and picnic areas. EMCA is a mutual benefit corporation composed of current residents of the mobile home park. WUF is an unincorporated association comprised of current mobile home park residents and other individuals who are "interested" in the use of public trust resources.[1] EMCA contends the Department abused its discretion by not proceeding according to law in preparing and certifying the EIR, thus violating the requirements of the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.),[2] and the trial court abused its discretion by not permitting the augmentation of the administrative record. We find no error and affirm the judgment.

I

We begin, as most CEQA cases do, with a description of the proposed project that is the subject of the current controversy along with some pertinent historical background. More details will be discussed in the course of our discussion of the issues.

---

[1] For convenience we will generally hereafter refer to EMCA and WUF collectively as EMCA, unless the context indicates otherwise.

[2] All further statutory references are to the Public Resources Code, unless otherwise indicated. The administrative guidelines implementing CEQA (Cal. Code Regs., tit. 14, § 15000 et seq.), will be referred to in what has become the customary format, "Guidelines, section . . . ."

In 1982, the Department adopted the general plan for Crystal Cove State Park. The park, acquired by the Department beginning in 1979 through a combination of purchase and gift, consists of approximately 2,800 acres of predominately undeveloped natural land including about three miles of coastline. The park is bisected by the Pacific Coast Highway (PCH). The inland area of about 2,343 acres is basically (for ease of discussion) on the north side of PCH, and is essentially comprised of the entire watershed of Moro Canyon—the predominate physical feature of the inland part of the park. The coastal strip of about 448 acres is on the south side of PCH and contains bluff areas and several beaches.

When acquired by the Department, the park had two developed areas on or near the coastal strip: Crystal Cove Historical District to the west (i.e., up coast) and the 287-unit El Morro Mobile Home Park to the east (i.e., down coast). The Department acquired the lands subject to existing leaseholds on those two developments. The general plan envisioned the eventual elimination of the private use of these two residential areas and their conversion to public uses—predominately day uses. As to the area surrounding the mobile home park, the general plan explained the area's two beaches, Moro Cove and Reef Point, were expected to support the highest intensity of beach-related uses. The general plan specifically mentioned that after the eventual demolition of the mobile home park, the area would be developed with parking areas, bathrooms, picnic facilities, and a portion of the mobile home park site would be developed with a campground for recreational vehicles and tent camping.

When the Department acquired the mobile home park, the tenants waived their rights to relocation benefits in exchange for 20-year leases with only nominal rent increases to keep up with inflation. The leases were extended for another five years and will expire in December 2004. Only about 10 percent of the units are currently owned or lived in by the lessees who signed the original long-term leases with the state.

The project area in its current state is described in the draft EIR (DEIR) that began circulating in May 2002. The major current features of the site are the mobile home park and an existing elementary school. The mobile home park is bisected by PCH. The elementary school is on the inland side of PCH, up coast from and adjacent to the mobile home park. Up coast from the elementary school is the current signalized park entrance road that leads to an existing inland visitor day use parking area, bathrooms, and visitor center (primarily accessing hiking and mountain bike areas). The proposed new

facilities will all be on the footprint of the existing mobile home park. The elementary school will remain essentially untouched (save for some improved access and fencing).

The majority of the mobile home park units are on the inland side of PCH divided into two physical areas—the upper terrace (located at a slightly higher elevation on a bit of a bluff), and Moro Creek Valley (as the name implies, the valley area through which Moro Creek runs after it leaves Moro Canyon). Most of the inland mobile home units are up coast from Moro Creek, but a few are below the creek. Moro Creek runs through the mobile home park and drains to the ocean through a tunnel going under PCH (the Moro Creek Tunnel). The Morro Creek Tunnel has historically been the primary method for pedestrians to access the beach from the inland part of the mobile home park. The rest of the mobile home park units are on the coastal strip down coast of Moro Creek—a strip of mobile homes running down the beach to the park boundary. The current entrances for both sides of the mobile home park are basically at the area of the tunnel.

The "preferred alternative" project described by the DEIR involves the approximately 45-acre footprint of the mobile home park. Upon expiration of the current leases (which require the tenants to remove the mobile homes), any remaining mobile home park buildings will be demolished and removed. Much of the site will be restored to a natural condition. The existing mobile home park sewage system is a septic system with leach fields bordering Moro Creek. It will be replaced with a municipal sewer connection. Other utilities will be abandoned or upgraded to support the new facilities. The project will have its main entrance at the current signalized entrance road up coast from the elementary school. The entrance road turns behind the school with the new park entrance inland of the school. The upper terrace part of the mobile home park will be converted into a 60-site campground, two combination restroom/shower buildings, and a laundry room. An entrance building, restrooms, visitor parking, and a dump station will be built on the inland side of the campground. The road from the campground will lead down into the Moro Creek Valley where an area will be regraded to create access and parking for 196 vehicles. Additionally, a small amphitheater, two restroom buildings, and three group picnic areas will be built up coast from Moro Creek. A large outdoor area down coast from the creek will be landscaped with native plants as an "outdoor classroom." The creek itself will be restored to a more natural streambed, with a new pedestrian/service vehicle bridge being built over the creek near PCH (inland). In addition to the existing

tunnel that provides beach access, a new traffic signal (at the current mobile home park entrance) was proposed to allow pedestrians to cross PCH to the beach. (More on this anon.) On the coast side of the project, at Moro Beach, after removal of the mobile home park structures, the site will be restored. One public restroom, a lifeguard tower/office, and 20 portable picnic sites will be constructed.

*The EIR/Project Approval Procedure*

In November 2001, the Department sent the notice of preparation of the DEIR to the requisite agencies. The notice of preparation and the DEIR identified Tina Robinson, located at the Department's San Diego office, as the contact person. The DEIR was completed on May 7, 2002, and circulated for public comments for 45 days. The public comment period closed on June 21. On August 13, the Department filed the notice of determination. The notice was signed by Bill B. Berry, Jr., the Deputy Director of Operations for the Department. The notice stated the Department had approved the project (i.e., the mobile home park conversion), the Department had reviewed the final EIR and in approving the project made the following findings: "[t]he project will not have a significant effect on the environment after mitigation[]" and "[an EIR] has been completed in compliance with CEQA, and has been presented to the decision-making body of this Department for its independent review and consideration of the information contained in the final EIR prior to approval of the project." It also stated mitigation measures were made conditions of the project and findings were made on the environmental effects of the project.

On September 12, 2002, EMCA filed its petition for writ of mandate naming as defendants the Department, Ruth Coleman (Acting Director of the Department), and Deputy Director Berry.[3] Following a hearing on August 15, 2003, the petition was denied, judgment entered for the Department, and this appeal ensued.

## II

*Standard of Review*

Because the Department's approval of the project did not require a public hearing,[4] our review is governed by section 21168.5. That section provides,

---

[3] Although EMCA and WUF were joint petitioners below, represented by the same counsel, they have filed separate appeals.

[4] Although public hearings are encouraged, CEQA does not require them on environmental documents or in connection with project approval. (Guidelines, §§ 15087, subd. (i), 15202.)

"In any action or proceeding . . . to attack, review, set aside, void or annul a determination, finding, or decision of a public agency on the grounds of noncompliance with [CEQA], the inquiry shall extend only to whether there was a prejudicial abuse of discretion. Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence." In this case those questions revolve around the EIR. " 'An EIR is an informational document which provides detailed information to the public and to responsible officials about significant environmental effects of a proposed project. [Citations.] It must contain substantial evidence on those effects and a reasonable range of alternatives, but the decision whether or not to approve a project is up to the agency. [Citations.]' [Citation.] Review is confined to whether an EIR is sufficient as an informational document. 'The court must uphold an EIR if there is any substantial evidence in the record to support the agency's decision that the EIR is adequate and complies with CEQA. [Citation.] [¶] CEQA requires an EIR to reflect a good faith effort at full disclosure; it does not mandate perfection, nor does it require an analysis to be exhaustive.' [Citation.]" (*Defend The Bay v. City of Irvine* (2004) 119 Cal.App.4th 1261, 1265 [15 Cal.Rptr.3d 176].)

### III

### *The Decision Maker*

EMCA contends the Department failed to proceed in the manner required by law because the EIR was not certified by the "decision maker," rather certification of the EIR was illegally delegated to a mere staff member, i.e., Deputy Director Berry. The contention is without merit.

■ The Guidelines require that prior to approval of a project, the lead agency (in this case the Department) shall certify: "(1) The final EIR has been completed in compliance with CEQA; [¶] (2) The final EIR was presented to the *decisionmaking body* of the lead agency, and that the *decisionmaking body* reviewed and considered the information contained in the final EIR prior to approving the project; and [¶] (3) The final EIR reflects the lead agency's independent judgment and analysis." (Guidelines, § 15090, subd. (a), italics added.) The notice of determination, signed by Deputy Director Berry, contained the appropriate certifications. In its answer to the petition, the Department admitted Deputy Director Berry was the person authorized by the Department to certify the EIR. EMCA argues Deputy Director Berry simply cannot be the legal "decision maker" because he is not a decisionmaking body, but merely an unelected official "with no accountability to the public."

■ Guidelines section 15356 specifically defines the "decision-making body" as "any *person* or group of people within a public agency permitted by

law to approve or disapprove the project at issue." (Italics added.) The Department does not have an elected body that acts as its decision maker. Rather, the Department is controlled by an executive officer (the Director), who is appointed by the Governor subject to confirmation by the Senate. (§ 501.) The Department alone has the authority to "administer, protect, develop, and interpret the property under its jurisdiction for the use and enjoyment of the public." (§ 5003.) Because the Department acts through the Director, or his or her designee (§ 546), then a fortiori the Director, or his or her designee, is the "decision-making body" within the meaning of CEQA.

■ EMCA argues the State Parks and Recreation Commission (the Commission) is the "decision-making body" within the meaning of CEQA that must approve the project. Not so. The Commission, also appointed by the Governor (§ 530), has responsibility for "establish[ing] general policies for the guidance of the director in the administration, protection, and development of the state park system." (§ 539.) Additionally, the Commission sets a "comprehensive recreational policy" for the state. (§ 540, subd. (b).) But it is the Department that executes those policies, and the Director (or his or her designee) is the person with the power to approve specific projects in furtherance of the Commission's policies. Furthermore, we note when a project is approved by a *local lead* agency and the CEQA determination is made by "a nonelected decisionmaking body . . . that certification, approval, or determination may be appealed to the agency's elected decisionmaking body, if any." (§ 21151, subd. (c).) But there is no comparable requirement contained in the CEQA provisions relating to approval of a project by a *state* agency. (See §§ 21100–21108.)

Deputy Director Berry signed the notice of determination certifying the EIR had been presented to the "decision-making body," (i.e., the Department) and independently reviewed, and considered prior to approval of the project. In their answer to the petition, the Department, Director Coleman, and Deputy Director Berry stated Deputy Director Berry was the person authorized to approve the project and certify the EIR, i.e., he was the Director's designee.

■ EMCA's reliance upon *Sundstrom v. County of Mendocino* (1988) 202 Cal.App.3d 296 [248 Cal.Rptr. 352], and *Kleist v. City of Glendale* (1976) 56 Cal.App.3d 770 [128 Cal.Rptr. 781], is misplaced. In *Keist*, a city council improperly delegated the task of certifying EIRs to a specially created board, prior to approval of the project by the city council. (*Id.* at p. 779.) In *Sundstrom, supra,* 202 Cal.App.3d 296, a county board of supervisors improperly delegated preparation of the environmental documents to the applicant, subject to review by planning staff. In short, those cases hold the decision maker may not delegate CEQA approval to a non-decision maker. But there has been no improper delegation here. Deputy Director Berry was

the Director's designee to approve the project, and accordingly, he was the appropriate person to certify the EIR.

In its reply brief, EMCA takes a different tack. It argues there is insufficient evidence that Deputy Director Berry was in fact authorized by the Director to approve the project (and accordingly to certify the EIR). Furthermore, it argues there is no substantial evidence Deputy Director Berry in fact did what the notice of determination said he did, i.e., there is no evidence he in fact independently reviewed the EIR or supporting technical documents prior to approving the project.

The point is waived. Although the petition contained allegations the EIR was not certified by the "decision-making body," EMCA omitted this issue from its statement of issues it intended to raise at trial. (§ 21167.8, subd. (f) [each party must file and serve statement of issues it intends to raise at hearing or trial].) EMCA did not pursue the issue at the hearing. "It is well established that a party may not raise new issues on appeal not presented to the trial court. [Citation.]" (*A Local & Regional Monitor v. City of Los Angeles* (1993) 12 Cal.App.4th 1773, 1804 [16 Cal.Rptr.2d 358].) EMCA cannot now contend Deputy Director Berry was not the Director's duly authorized designee with respect to this project when it failed to raise the argument below.

EMCA argues waiver is inapplicable because the new issue involves "purely a question of law based upon uncontroverted facts and involving important questions of public policy . . . ." (*A Local & Regional Monitor v. City of Los Angeles, supra*, 12 Cal.App.4th at p. 1804, fn. 13.) That simply is not the case here. In signing the notice of determination, Deputy Director Berry certified the appropriate decision maker had reviewed it. In their answer to the petition, the Department, the Director, and Deputy Director Berry confirmed Deputy Director Berry was the authorized decision maker.

■ In any event, EMCA's argument fails because it has failed to prove Deputy Director Berry was not the authorized decision maker or that he failed to carry out his duties. There is a statutory presumption that an official duty has been regularly performed. (Evid. Code, § 664.) The law requires the "decision-making body" to independently review the EIR and consider the information therein prior to final approval of the project. The notice of determination states this was done. EMCA has offered nothing other than its sheer speculation to suggest otherwise.

## IV

### *Technical Reports*

EMCA argues the Department failed to proceed in a manner required by law because the DEIR did not adequately cite the various technical studies and reports used in its preparation. We find no reversible error.

EMCA criticizes the DEIR's failure to rigidly adhere to Guidelines section 15148, which provides, "Preparation of EIRs is dependent upon information from many sources, including engineering project reports and many scientific documents relating to environmental features. These documents should be cited but not included in the EIR. The EIR shall cite all documents used in its preparation including, where possible, the page and section number of any technical reports which were used as the basis for any statements in the EIR."

The introduction to the DEIR's discussion of the environmental effects of the preferred alternative project and the proposed mitigation measures states, "This section describes the probable impacts of the Preferred Alternative [i.e., the campground conversion project]. The environmental impact analysis and the proposed mitigation measures are based on preliminary project design and current information and circumstances. *Technical reports and analyses were prepared as part of the environmental studies for the proposed action.* These reports analyze existing conditions and identify potential impacts for the Preferred Alternative. This section summarizes the findings of these reports and analyses and incorporates information that may be more current [than] the information contained in the technical studies. *The following studies were conducted for this EIR: wave runup analysis, biology report and natural resources constraints analysis, cultural resources constraints analysis, hydraulic study, traffic analysis, and preliminary geotechnical studies.*" (Italics added.) The DEIR did not give the specific title for each report, nor did it include the reports as appendices.

Several reports and studies were prepared as part of the environmental review process. They included the following: (1) a seven-page "Natural Resource Constraints Analysis" prepared in July 2001 by the Department, described specific areas of the project where sensitive wildlife species (e.g., birds) existed, and identified design and construction constraints that should be put in place in order to minimize impacts on the sensitive wildlife (such as no construction activities during nesting season); (2) a three-page "Cultural Resources Constraints Analysis" prepared by the Department in August 2001, identified three culturally sensitive areas within the project (two middens, one archeological site), and set forth constraints to be placed on the project and construction to avoid disturbing the CSA's (e.g., limiting construction staging

sites, capping the archeological site, fencing the midden areas during construction, monitoring construction activities); (3) a 12-page "Biological Resources Report" prepared by a Department biologist in October 2001 (sometimes called the "Roja Report"), detailed the biological resources within the project; (4) a "Signal Warrant Analysis" prepared by RBF, a private consulting firm, on March 7, 2002, concerned the proposed signalization of PCH at the Moro Creek Tunnel, contained technical information on the projected pedestrian crossings, and conducted the CalTrans signal warrant analysis to determine if a signal was warranted; and (5) a "Wave Runup Analysis" was prepared by Skelly Engineering on February 13, 2002, which set forth technical data on historical wave and tide height, and water overrun onto road and the proposed lifeguard station, for engineering purposes. The substance of the reports is summarized in the DEIR.

During the public review period, counsel for EMCA wrote to the individual designated in the DEIR as the Department's contact person (Ms. Robinson), and complained about the failure of the DEIR to specifically reference each of the technical reports. The Department responded with a list of the reports, and advised EMCA they were available for public review in the Department's San Diego office. In a subsequent letter, EMCA acknowledged it had obtained copies of all the technical reports and studies. Another member of the public, who is not a party to this proceeding, similarly complained about the absence of specific cites to the technical reports, asked for copies of them, and was accommodated. WUF also complained about inadequate references to technical reports, but did not request to review them. A supplemental appendix made part of the final EIR included several of the reports including the "Natural Resource Constraints Analysis," the "Biological Resources Report," the "Signal Warrant Analysis," and the "Wave Runup Analysis."

EMCA complains the DEIR's failure to specifically reference each of the reports by title, author, and date, instead referring to them only by general subject matter, deprived the public of critical information about the existence of those reports and precluded the public from being able to review the technical information. In short, it accuses the Department of engaging in "hide-the-ball" tactics. EMCA invokes *Protect The Historic Amador Waterways v. Amador Water Agency* (2004) 116 Cal.App.4th 1099, 1105 [11 Cal.Rptr.3d 104], in which the court noted that, " 'When the informational requirements of CEQA are not complied with, an agency has failed to proceed in "a manner required by law" and has therefore abused its discretion.' [Citation.]" But that case involved an EIR that failed to analyze a particular significant environmental effect of the proposed project. It did not involve the matter of interpretation of particular Guidelines.

■ Although certainly "we must ensure strict compliance with the procedures and mandates of [CEQA]" (*Save Our Peninsula Committee v. Monterey County Bd. Of Supervisors* (2001) 87 Cal.App.4th 99, 118 [104 Cal.Rptr.2d 326]), but we must also be mindful of the purposes of the statute in deciding how strict to be in interpreting the Guidelines. The Guidelines direct the lead agency to "cite all documents used in its preparation . . . ." (Guidelines, § 15148.) But they do not tell the lead agency how specific it must be in those citations other than to suggest using page and section numbers when possible. Here, the Department disclosed the existence of all of the technical reports, by subject matter; it simply failed to give the specific titles to each report. " 'CEQA requires an EIR to reflect a good faith effort at full disclosure; *it does not mandate perfection* . . . .' " (*Defend The Bay v. City of Irvine, supra,* 119 Cal.App.4th at p. 1265, italics added.) Certainly, the Department could have included more detail about the titles of the technical reports. But we simply cannot say the DEIR failed to advise the public about the existence of this technical information or that the lack of specific titles constitutes a failure to comply with CEQA's procedural requirements. In fact, EMCA and other members of the public were obviously alerted to the existence of the technical reports and obtained them from the Department. In its separate brief, WUF asserts it has never seen any of the technical reports. But nothing in the record suggests WUF was precluded from doing what other members of the public did—i.e., ask for them. The existence of the technical reports was revealed in the DEIR.[5]

Finally, EMCA argues the failure to specifically cite the technical reports in the DEIR "undermines the trustworthiness of the [DEIR]." We fail to see how. We have reviewed the DEIR and the specific technical reports. We agree with the trial court's assessment that the information in the reports was either repeated in the DEIR or summarized in the DEIR.

V

*Other Reports*

We separately address EMCA's complaints about two additional reports that were part of the administrative record.

---

[5] For the first time in its reply brief, WUF complains that the Department did not make the technical reports and studies available to the public in a public place located within Orange County. It relies on Guidelines, section 15150(b), which provides that if an EIR incorporates by reference another document, the documents so incorporated by reference shall be made available along with the EIR in a public place in the county where the project is located (e.g., library or other public building if the lead agency has no office in the county). Since the EIR did not incorporate by reference any of the technical documents, that section is inapplicable. The Department made the EIR available at several Orange County public libraries.

## 1. *The Traffic Study*

The DEIR concluded the project would have a less than significant impact on traffic. Using the "ITE, Trip Generation 6th Edition," it projected the project would generate an estimated average daily trips (ADTs) of 1,476, as compared to the current mobile home park with ADTs of 1,380. As to pedestrian access, the DEIR noted a potentially significant impact (public safety) due to the estimated "1000 people per day [who] would cross the [PCH] to access the beach during peak use periods." Accordingly, the DEIR proposed the signalized pedestrian crossing at Moro Creek Tunnel to mitigate the impact on public safety.

On August 12, 2002, a "Trip Generation and Vehicle Occupancy Analysis" was completed by RBF consulting. The report is 18 pages long accompanied by supporting data including 100 pages of actual traffic counts taken on the first weekend in August 2002. The conclusion of the report is that based on ITE trip generation data the forecasted ADTs would be 1,476 on weekdays, 1,686 on Saturdays, and 1,587 on Sundays. However, the traffic count data showed lower volumes—of 1,284 on Saturdays, and 1,375 on Sundays, and because usage would be lower on weekdays, the traffic volume would be lower on weekdays. The report also forecast daily "pedestrian crossings" (as opposed to the number of people each day) of PCH from the parking area of 1,693 on Saturdays and 1,820 on Sundays.

The final EIR was completed the next day, August 13, 2002. It again concluded the project would have a less than significant impact on traffic, revising its numbers to reflect the August 12 traffic study. As to pedestrian access, the final EIR stated there would be an estimate 1000 people per day crossing PCH "each way."

We are, quite frankly, perplexed by EMCA's arguments regarding the traffic study. First, EMCA complains the data in the traffic study differed significantly from the final EIR. Specifically, it complains the traffic study projected daily "pedestrian crossings" of PCH of 1,693 on Saturdays and 1,820 on Sundays. But the final EIR stated an estimated 1000 people per day would cross PCH "each way." Thus, EMCA argues the EIR understated pedestrian crossing by almost one-half. But EMCA does not take its argument to the logical conclusion, i.e., that recirculation of the EIR was required due to significant new information. (See § 21092.2; Guidelines, § 15088.5.) Furthermore, the traffic study did not contain significant new information. One thousand people crossing *each way* equals 2000 crossings. The EIR did nothing more than to round up the numbers.

Next EMCA complains the traffic study is four times longer than the EIR itself and contains an analysis "100 times more expansive" than the DEIR's

analysis of traffic. It suggests that given the timing of the traffic report being completed the day before the EIR, and the enormous length of the document, it is not physically possible (or plausible) the decision maker (i.e., Deputy Director Berry) actually considered the information contained in the traffic study when certifying the final EIR.

We have fully reviewed the traffic study. True, the document is 295 pages long. But only 18 of those pages contain any sort of analysis and most of that is in table form. The remaining 275-plus pages are essentially data sheets. The heart of the document is its one-page conclusion about the number of trips forecast. The final EIR was specifically amended to reflect the relatively minor changes in the traffic information. We presume the Department considered the information.

2. *Hydrology Study*

EMCA also complains about a hydrogeologic study prepared by the Department and submitted to the San Diego Regional Water Quality Control Board (RWQCB) in September 2002, one month after the EIR was certified and the project approved. It complains the existence of this report further demonstrates the Department hid technical reports from public view and "proves that its decision was a foregone conclusion." The contention is meritless.

The DEIR discussed the project's impact on Moro Creek and watershed resources. In the section on significant impacts, the DEIR explained there could be some temporary adverse impacts associated with demolition of the mobile home park's structures, and with construction of the new project facilities in the form of runoff and soil erosion. But overall, the DEIR anticipated the project would benefit Moro Creek and its watershed. The DEIR explained the mobile home park's onsite sewer system (septic tanks and leach fields) was failing. Currently effluent collected from the mobile homes is pumped into leach fields alongside Moro Creek up canyon from the mobile home park. Water quality tests performed by the County of Orange Health Department and the Department indicated unacceptable bacteria levels in the creek itself. The current septic system would be removed and replaced with a connection to the municipal sewers.

In its comments on the DEIR, EMCA complained about the Department's assertion the current sewer system was failing as being unsupported by data. It noted that in April 2001, the San Diego RWQCB ordered the Department to complete a report on waste water discharge, which had not yet been completed. In its response to EMCA's comment, the Department noted weekly testing by the San Diego County Health Department showed high levels of

bacteria, the Department was conducting additional tests to determine the source of the bacteria (natural or from sewage), and the test results would be available for the San Diego RWQCB in late 2002.

The final EIR was revised to reflect this information. It stated because of the year-round presence of water in Moro Creek, which naturally would only have water intermittently, and the high bacteria levels, it was suspected the onsite sewage treatment system was failing. Testing was ongoing to determine the source of the bacteria.

In September 2002, the Department completed a hydrogeologic report for the San Diego RWQCB. As background, the report explained that in 2000, the Department applied for permission from the San Diego RWQCB to install a disinfection system for wastewater at the mobile home park. This was the first San Diego RWQCB staff knew of the existing sewage treatment facilities at the site. Ultimately, in April 2001, San Diego RWQCB requested the Department to complete a statutorily mandated waste discharge report. (See Wat. Code, § 13260.) One of the required elements of that report was a comprehensive hydrogeologic investigation. The bottom line of the hydrogeologic investigation was that water sources within Moro Creek downstream of the leach fields were predominantly from wastewater disposal (i.e., percolation from the leach fields), but bacteria from the wastewater was effectively filtered out (i.e., bacteria was from natural not human sources).

■ Water Code section 13260 requires any person who discharges wastewater, other than into a community sewage system, which could affect water quality within the state to comply with certain reporting requirements. The report about which EMCA complains was prepared for the San Diego RWQCB in compliance with the RWQCB's directives. EMCA is not suggesting the Department's issuance of report of a waste discharge to the RWQCB, or compliance with its statutory duties under the Water Code required some separate compliance with CEQA. In other words, it does not suggest issuance of the report was itself a project under CEQA, or that the report contained significant new information that required the Department to prepare a supplemental or subsequent EIR for the project. (See Guidelines, §§ 15162, 15163.) Rather, it argues the completion of these statutorily required reports *after* certification of the EIR somehow casts doubt on the EIR. We do not see how. The EIR disclosed the concerns about the source of year round water in Moro Creek and the presence of unacceptable levels of bacteria. It specifically noted testing was ongoing and EMCA, by its comments, indicated it too was aware of the testing. But the testing (and the hydrogeologic study) was not completed as part of the decisionmaking process vis-á-vis the mobile home park conversion project, rather it was completed as part of its current statutory obligations as a waste discharger. Indeed as part of the project the

Department will get out of the "waste discharge business" by connecting the park to the municipal sewer system. Thus completion of the hydrogeologic report had no bearing one way or the other on the Department's decision to approve the project.

## VI

### *Motion to Augment Administrative Record*

EMCA contends the court erred by denying its motion to augment the administrative record. We disagree.

EMCA elected to prepare the administrative record itself. (See § 21167.6.) Prior to the hearing on its mandamus petition, EMCA sought to augment the administrative record with three documents. The first document was a one-page printout from "CEQANET," the California State Clearinghouse's searchable online EIR database listing three EIR's pertaining to Crystal Cove State Park submitted to the State Clearinghouse by the Department. One was the EIR at issue in this proceeding (the El Morro Conversion). One, dated April 2001, pertained to the Crystal Cove Historical District and described the project as involving health and safety investigations, testing, site repair, stabilization, and cleanup. The third EIR, dated October 17, 2002 (two months after this project was approved), also pertained to the Crystal Cove Historical District, and described the project as including a general plan amendment establishing a range of uses for the historical district and surrounding area. The second "document" proffered by EMCA was a one-page Department newsletter and a three-page Department news release both dated January 2003, stating the project had been modified to remove the pedestrian crossing. The third document was a photocopy of a page from the County of Orange Transportation Implementation Manual dated March 15, 1994. The motion to augment was denied.

EMCA characterizes this as an issue of "augmenting" the administrative record with documents that should have been part of the record. It accuses the Department and the trial court of having improperly "truncated" the administrative record. Accordingly, it contends the trial court's ruling runs afoul of this court's opinion in *County of Orange v. Superior Court (Vedanta Society of Southern California)* (2003) 113 Cal.App.4th 1 [6 Cal.Rptr.3d 286]. That case is completely inapplicable. It involved an *administrative mandamus* proceeding (see § 21168, Code Civ. Proc., § 1094.5) to review an action of the County acting in its adjudicatory (i.e., quasi-judicial) capacity. (*County of Orange v. Superior Court (Vedanta Society of Southern California), supra,* 113 Cal.App.4th at p. 11, fn. 2.) The case considered a project opponent's

attempt to prohibit the County from showing its CEQA decision was supported by substantial evidence by removing from the administrative record items that by statute were properly included in the administrative record. (*Id.* at p. 7.)

By contrast, this case involves an attempt to place before the trial court, documents that were *extrinsic* to the administrative record (i.e., that either were not before the Department or which involve postdecision changes). Furthermore, it involves review of the Department's quasi-legislative approval of a public improvement on public land. (See *Oceanside Marina Towers Assn. v. Oceanside Community Development Com.* (1986) 187 Cal.App.3d 735, 745 [231 Cal.Rptr. 910] ["decisions of public entities as to the location of public improvements are legislative in character"].) Accordingly, EMCA's effort to place extra-record documents before the trial court is strictly controlled by *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559 [38 Cal.Rptr.2d 139, 888 P.2d 1268] (*Western States Petroleum*).

■ *Western States Petroleum* confirmed that judicial review of quasi-legislative actions sounds in traditional mandamus (Code Civ. Proc., § 1085) and thus, in the case of a CEQA challenge to such an action, review is under section 21168.5—i.e., the inquiry extends only to whether there was a "prejudicial abuse of discretion" because either the agency has not proceeded in a manner required by law or its decision is not supported by substantial evidence. (*Western States Petroleum, supra,* 9 Cal.4th at pp. 567–568.) *Western States Petroleum* also confirmed "extra-record evidence is generally not admissible in traditional mandamus actions challenging quasi-legislative administrative decisions on the ground that the agency 'has not proceeded in a manner required by law' within the meaning of . . . section 21168.5." (*Western States Petroleum, supra,* 9 Cal.4th at p. 576.) There is an exception to the rule where the action challenges "ministerial or informal administrative actions if the facts are in dispute." (*Ibid.*) Obviously, the exception does not apply, thus the rule does. The trial court properly refused to consider items that were not part of the record before the Department.

We have further comments regarding the proffered extrinsic evidence. First, as to the photocopy of the page from the 1994 County of Orange Transportation Implementation Manual, EMCA has not made any argument on appeal as to why the document was in any way relevant. We will not speculate as to its possible relevance. We note that had EMCA believed it was pertinent to its objections to the Department's decision, it was incumbent

on EMCA to place it in the administrative record before the Department approved the project.

■ Next, as to the one-page State Clearinghouse list of EIR's, EMCA argued the document was relevant to prove the Department was improperly "piecemealing" the project. It is well established CEQA prohibits piecemeal environmental review by " 'chopping a large project into many little ones— each with a minimal potential impact on the environment—which cumulatively may have disastrous consequences. [Citations.]' " (*Citizens Assn. for Sensible Development of Bishop Area v. County of Inyo* (1985) 172 Cal.App.3d 151, 165 [217 Cal.Rptr. 893].) EMCA does not pursue the "piecemealing" argument on appeal. What we can glean from the record is that EMCA contended the Department was piecemealing the renovation and restoration of the Crystal Cove Historical District and the El Morro Mobile Home Park conversion so as to minimize the significant cumulative impact of both projects on housing.[6] But the only proffered "proof" was the one-page computer printout indicating two EIR's were prepared for the Crystal Cove Historical District. We are at a loss to see how the mere fact there are two other EIR's relating to another project within the park supports EMCA's point.

Finally, as to the proffered newsletter and news release, we find no error in the court's refusal to admit these documents. The fact the documents were offered to prove, that the proposed signalized pedestrian crossing has been deleted from the project, was readily admitted by the Department below. EMCA argues on appeal that deletion of the signalized crossing is a significant change to the project, which this EIR is inadequate to address.[7]

---

[6] In comments to the DEIR, EMCA complained the elimination of private leaseholds within the park had a significant negative effect on housing in Orange County. The mobile home park has 297 units. Crystal Cove Historical District has 46 cottages, which have already been vacated by private residents. In short, EMCA argued that evaluating the projects separately allowed the Department to minimize the impact of "displacing 340 families." The final EIR noted very few of the mobile homes are occupied by full-time residents—the vast majority are vacation homes. The response to the comments noted the number of residents actually being relocated was far smaller than the number of "units" being lost.

[7] The irony of EMCA's argument is not lost on us. The General Plan adopted for the Crystal Cove State Park in 1982, discussing the safe access issue anticipated access would be provided by the existing Moro Creek Tunnel and in the future by an over crossing near the elementary school. The DEIR identified pedestrian and emergency vehicle access as a potential significant impact of the project. The Moro Creek Tunnel, currently the primary access to the beach, was not an all-weather access. Thus, the DEIR proposed the pedestrian traffic signal noting construction of any new traffic signal is subject to approval by CalTrans. The DEIR mentioned several measures that would be taken to improve the tunnel as access. During the public comment period numerous negative comments were received about the proposed signalized pedestrian crossing including from EMCA. By and large the comments, including those from the EMCA, were that the proposed signalized pedestrian crossing should be eliminated from

But the postdecision change is completely irrelevant in *this* proceeding. It is axiomatic that once an agency has given its requisite approval to a project, CEQA's role in *that project* is completed. Judicial review is limited to the CEQA determination for the project approved. If significant new information thereafter develops, a supplemental or subsequent EIR might be required in connection with the agency's *next* discretionary approval, if any. (§ 21166; Guidelines, § 15162.) But information arising *after* an approval does not require reopening of that approval. (Guidelines, § 15162, subd. (c); 1 Kosta & Zischke, Practice Under the Cal. Environmental Quality Act (Cont.Ed.Bar 2003) § 19.28, pp. 734–735.) Furthermore, "if an agency authorizes major modifications to a project without [first] determining whether further CEQA review is required, its decision to approve the changes to the project may be set aside." (1 Kosta & Zischke, *supra,* § 19.29, p. 736; see also *Concerned Citizens of Costa Mesa, Inc. v. 32nd Dist. Agricultural Assn.* (1986) 42 Cal.3d 929 [231 Cal.Rptr. 748, 727 P.2d 1029].) But whether the changes necessitate further CEQA review is an issue that must be addressed by the Department in the first instance—not by the trial court or this court. (Guidelines, § 15004, subd. (a); see also *Vollstedt v. City of Stockton* (1990) 220 Cal.App.3d 265, 279 [269 Cal.Rptr. 404].) "If post-approval environmental review were allowed, EIR's would likely become nothing more than *post hoc* rationalizations to support action already taken." (*Laurel Heights Improvement Assn. v. Regents of University of California* (1998) 47 Cal.3d 376, 394 [253 Cal.Rptr. 426, 764 P.2d 278].)

In short, we cannot review the adequacy of *this EIR* and the project described by *this EIR* in light of post-approval changes to the project. If, as EMCA suggests, the removal of the signalized pedestrian crossing constituted a substantial change to the project requiring a major revision to the EIR (see § 21166; Guidelines § 15162), then it is incumbent upon them to challenge the revised project. They have not. And we agree with the Department the time for these petitioners to make such a claim has long since passed. The Department announced the deletion of the signal in January 2003 and we know from this record that the petitioners were aware of the change *at the very latest* on June 24, 2003, when they filed their opening brief and request to augment the record. Accordingly, the 180-day time period in which to challenge the allegedly revised project has expired. (§ 21167, subd. (a).)

---

the project because it posed a serious traffic hazard and the existing tunnel could be maintained to provide access. In the petition EMCA alleged the proposed signal, rather than mitigating the project's impact on public safety, increased the risk to public safety because an at-grade crossing (even with a signal) would expose pedestrians to several lanes of high-speed traffic on PCH and the signalized crossing was not contemplated by the general plan.

Nor can we agree that the petitioners have adequately challenged the revision in *this* proceeding. Petitioners never sought to amend their petition to challenge the revised project or to argue a supplemental EIR was required. Their only effort at raising it was to introduce the press release stating the signalized pedestrian crossing had been deleted from the project.

Finally, even had the court admitted the document, it was hardly adequate to support a showing that a supplemental EIR was required. The deletion of the crossing simply was not a substantial change in the project requiring a major revision of the EIR. (§ 21166, subd. (a).) "[W]hen circumstances change in a relatively minor fashion or do not cause any significant impacts other than those already contemplated by the EIR, CEQA does not require preparation of a subsequent EIR." (*A Local & Regional Monitor v. City of Los Angeles, supra,* 12 Cal.App.4th at p. 1803 [16 Cal.Rptr.2d 358].) The DEIR and the final EIR discussed the pedestrian access/safety issue. The Moro Creek Tunnel was one way to access the beach from the inland parking area; the proposed signalized crossing was another. It was always clear that any such signal was subject to CalTrans approval. We simply cannot say the change was unforeseen by the EIR or required a different analysis.

The judgment is affirmed.

Rylaarsdam, Acting P. J., and Fybel, J., concurred.